Argued October 10, 1950; affirmed February 21, 1951

# ROGERS, Adm'r, v. SOUTHERN PACIFIC CO. et al. AND McKENZIE

227 P. (2d) 979

*Allan G. Carson,* of Salem, argued the cause for respondent and cross-appellant. With him on the brief were Wallace P. Carson and Peery T. Buren, of Salem.

*H. H. Phillips,* of Portland, argued the cause for appellant. With him on the brief were Griffith, Peck, Phillips & Coughlin, of Portland.

*Alfred H. Corbett,* of Portland, argued the cause for respondents. With him on the brief were Koerner, Young, Swett & McColloch and James C. Dezendorf, of Portland.

Before Lusk*, Chief Justice, and Brandt†, Rossman, Hay and Latourette, Justices.

LUSK, J.

This case grows out of a collision at a railroad crossing between an automobile and a freight train of the Southern Pacific Company. The automobile was driven by the defendant Lloyd L. McKenzie. Riding with him as his guest was Betsey Lou Rogers. She was killed in the accident, and the administrator of her estate sued McKenzie, the railroad company, and Harvey E. Holzkamp, engine foreman of the train. The jury returned a verdict for the plaintiff against McKenzie and in favor of the other two defendants. The defendant McKenzie has appealed from the judgment against him, and the plaintiff has appealed from the judgment for Southern Pacific Company and Holzkamp.

The accident occurred at about 12:15 A. M. on August 30, 1947, on a spur track which crosses State Street immediately east of the east city limits of the city of Salem, and enters the grounds of the Oregon State penitentiary a short distance north of State

---

* Chief Justice when this case was argued.

† Chief Justice when this opinion was rendered.

Street. All the evidence is to the effect that, while it was a dark night, there was no haze or fog and the visibility was good. The freight train consisted of a locomotive, tender and six cars loaded with hog fuel destined for the penitentiary. State Street runs east and west. The train approached the crossing from the south, the locomotive, which was in reverse, being at the southerly end. On reaching the crossing the train stopped while William D. Galloway, the "field man" who was at the front of the lead car, looked in both directions on State Street, and, seeing no traffic, gave the signal to go ahead. The train then proceeded across State Street at a speed of two or three miles an hour, and at least three cars had completed the crossing when the collision occurred. At about this time the defendant was driving a Chevrolet coupe east on State Street from the direction of the city at a very high rate of speed according to most of the testimony. Immediately before the accident he passed another car going in the same direction, skidded some 180 feet, swerved sharply to his left, and crashed into the hog fuel car which was the fourth one in the train from the lead car. The collision occurred in the north half of the highway, the Chevrolet hitting the railroad car almost broadside. Miss Rogers died shortly afterwards. The defendant was badly hurt, and, at the time of the trial, was able to throw very little light on the circumstances of the accident. He testified: "All I can remember is that when I passed it (the other car) my lights showed the train, and I saw those coal cars; and I remember turning and hitting."

The foregoing statement should suffice for a consideration of the defendant McKenzie's appeal.

### Appeal of Defendant McKenzie

■ Since the decedent was a guest of the defendant McKenzie it was incumbent on the plaintiff to establish that her death was proximately caused by his gross negligence or reckless disregard of the rights of others in the operation of his automobile. No question is made here as to the sufficiency of the proof to take the case to the jury. All the assignments of error are based on exceptions taken to instructions given by the court.

The first five assignments present practically the same contention, namely, that the court instructed the jury on ordinary negligence and the statutory rules of the road in such a way as to confuse the jury and leave them in doubt as to the duty of the plaintiff to show that the accident was caused by the defendant's gross negligence. The instructions which are the subjects of these assignments of error may be summarized as follows: The court defined negligence as it is usually defined. The court charged the jury that it was the duty of the defendants to exercise reasonable care in the circumstances and explained what reasonable care means. The court told the jury of the statutory rules of the road applicable under the evidence, and that a violation of any of these provisions by an operator of a motor vehicle would be negligence per se or negligence in and of itself, and that if the jury should find from a preponderance of the evidence that defendant McKenzie violated any one or more of such rules of the road, then they must find that he was guilty of negligence. The court instructed the jury upon the duty of a driver of an automobile to maintain a reasonably constant and continuous lookout, and upon the designated speed at the place of the accident, and that any speed in excess of such designated speed is prima

facie evidence of a violation of the basic rule as previously defined.

These instructions, it is said, are contradictory to instructions which the court gave later advising the jury that they could not find against the defendant McKenzie unless satisfied that the death of the decedent was caused by McKenzie's gross negligence. It is argued that, in view of this inconsistency, it is impossible to say which instructions the jury followed and that the judgment should therefore be reversed.

In order to consider these contentions in their proper light it is necessary to review the instructions as a whole. The court first explained to the jury the issues as made by the pleadings, which included allegations of gross negligence against the defendant McKenzie and of negligence against defendants Southern Pacific and Holzkamp, as well as charges by the latter two that the negligence of McKenzie was the sole proximate cause of the collision, and a like charge by McKenzie against his co-defendants. Immediately thereafter the court defined negligence, proximate, cause and reasonable care, following these instructions with an explanation of the statutory rules of the road, then with the instructions on lookout and designated speed. The court then read to the jury the statute governing the liability of the operator of an automobile to his guest, following which he said: "Because of this law I instruct you that defendant McKenzie would not be liable if he was guilty of only ordinary or simple negligence. Before you would be warranted in returning a verdict against him, you must find that he was guilty of gross negligence or reckless disregard of the rights of others", etc. The instructions then proceeded for nearly three pages of the transcript with

an explanation of the meaning of gross negligence and reckless disregard of the rights of others. The instruction that the jury could not find against the defendant McKenzie unless they found him guilty of gross negligence or reckless disregard of the rights of others was repeated. The jury were told that it was not enough that the plaintiff show that defendant McKenzie did not watch as carefully as ordinarily prudent drivers would do, and that they could not return a verdict for the plaintiff against the defendant McKenzie based upon speed alone, and that in both these particulars gross negligence or reckless disregard of the rights of others must be established.

Again, the jury were told that if the gross negligence of the defendant McKenzie combined with the negligence of the other defendants to cause the death of the decedent, the jury's verdict should be for the plaintiff and against all the defendants.

In another instruction the court spoke of negligence "as distinguished from gross negligence", and once more, before the court gave certain instructions affecting the defendants Southern Pacific and Holzkamp, the court repeated, "The defendant Lloyd L. McKenzie can be held liable only in the event it is established by the plaintiff to a moral certainty or conviction that he was grossly negligent", etc.

This was a three-cornered controversy. The defendants Southern Pacific and Holzkamp were charged with negligence, hence it was necessary to instruct upon that subject. Apart from this, it is entirely proper in a gross negligence case to instruct the jury on the meaning of negligence. In its simplest definition gross negligence means nothing more nor less than "great negligence". How it is possible to

reach the conclusion that a party has been guilty of gross negligence without an understanding of the meaning of the term negligence is something difficult to conceive. So, also, as to the applicable statutory provisions governing the operation of a motor vehicle. Plaintiff was entitled to have the jury informed about them by the court and that their violation constitutes negligence. When such a violation is established to the jury's satisfaction it is for the jury to determine whether the defendant's conduct in that particular was of such an aggravated character as to constitute gross negligence.

In *Turner v. McCready*, 190 Or. 28, 222 P. 2d 1010, 1023, decided since this case was argued, it appears that nearly nine hours after the case had been submitted to the jury the court, at the jury's request, gave further instructions at length upon ordinary negligence alone, no mention being made of any rule concerning gross negligence. We held that this was reversible error. But that was because of the peculiar circumstances of the case, and our opinion recognized that "when a trial court is instructing the jury in a guest case *it is not necessarily error to define negligence in one paragraph and gross negligence in another.* The rule which requires that the instructions should be construed as a whole will normally be applied, although we think it the better practice for the court in the very instructions which define negligence to caution the jury that negligence alone is not ground for recovery."

■ Reading the instructions in this case as a whole, we think that they sufficiently apprised the jury that the defendant McKenzie's duty to his guest was to be measured by the standards fixed by the guest statute.

There was no contradiction in the instructions as there was in *Smith v. Laflar,* 143 Or. 65, 69, 20 P. 2d 391, which is relied on by the defendant. There a judgment for the plaintiff was reversed for the reason, among others, that the court in a guest case instructed the jury as follows: "The driver of a motor vehicle owes to those riding with him the duty to exercise ordinary and reasonable care and not to increase the danger or to create any new danger". This instruction was properly held to be "absolutely contradictory and inconsistent with those given relative to gross negligence." In view of this inconsistency the court was unable to say with any degree of certainty by which standard of care the conduct of the defendant was measured. In the instant case no such inconsistency appears in the instructions. It is true that *Smith v. Laflar* appears to have been decided also upon the ground that the court in defining negligence failed to tell the jury that such definition was given for the purpose of distinguishing it from gross negligence. While that is the safer course, it does not necessarily follow that its omission is always ground for reversal. The question in every case is whether, upon a view of the instructions as a whole, it can be reasonably said that the jury was probably misled, and, as already stated, we are of the opinion that that is not true of the instructions under consideration.

The only other assignment of error in defendant McKenzie's brief is based upon the following instruction to which his counsel duly excepted:

"It is contended by plaintiff that defendants Holzkamp and Southern Pacific Company were negligent in that they failed to sound any warning by whistle, bell, or otherwise, of the approach of the freight train.

"I instruct you, however, that there is no evidence to sustain this charge and you must, accordingly, disregard the same in your determination of the case."

Assuming, what the plaintiff contests, that the defendant McKenzie is in any position to challenge the instruction, we are of the opinion that, for reasons to be stated in our consideration of the appeal of the plaintiff, the instruction was free from error.

An objection to the instruction on designated speed not covered by what has been said should be noticed. The instruction was as follows:

"If you find that defendant McKenzie was driving and operating his automobile at a rate of speed in excess of 20 miles an hour when approaching within 100 feet of the grade crossing of defendant Southern Pacific Company's steam railway, and that his view of such crossing or of any traffic on such railway within 400 feet in either direction then and there was obstructed, then you must find that he was driving in excess of the speed designated by statute for that particular location. In this connection, you are instructed that any speed in excess of such designated speed is prima facie evidence of a violation of the basic rule as I have defined that rule to you. Prima facie evidence, or primary evidence, is defined as follows: That evidence which suffices for the proof of a particular fact until contradicted and overcome by other evidence."

The defendant McKenzie excepted to the instruction on the grounds, among others, that it was not applicable and that a violation of the statute would not be the proximate cause of the accident.

Chapter 458, Oregon Laws, 1941, § 1 (b), contains provisions fixing the designated speeds for motor vehicles in various described localities. Twenty miles

an hour is designated "When approaching within 100 feet of a grade crossing of a steam, electric or street railway where the driver's view of such crossing or of any traffic on such railway within a distance of 400 feet in either direction is obstructed." The same statute (§ 1 (b)) makes speed in excess of a designated speed prima facie evidence of a violation of the so-called basic rule. Ch. 458, Oregon Laws, 1941, § 1 (b).

The defendant McKenzie argues that because the train was occupying the crossing at the time his automobile approached it "the driving of an automobile at a rate of speed in excess of twenty miles per hour while the driver's view of any traffic on said railway within four hundred feet in either direction from said crossing was obstructed could not have been a proximate cause of said collision."

■ We think the argument unsound. There was evidence that at this crossing the view of a driver approaching from the west was obstructed to the south within 400 feet. The statute makes no exception of an occupied crossing. Therefore, the area 100 feet immediately west of the crossing was an area to which the twenty-mile designated speed applied. Now, while it is true that the obstructed view to the south did not cause the accident, the speed of the automobile did, and, therefore, a law regulating speed in that area is pertinent. Had it been observed by McKenzie, there might have been no accident.

### Appeal of Plaintiff

The assignments of error in plantiff's brief on cross-appeal from the judgment in favor of Southern Pacific and Holzkamp are all based upon instructions given by the court withdrawing certain charges of neg-

ligence against those defendants. But, being of the opinion that their motion for a directed verdict should have been allowed, we find it unnecessary to discuss the assignments of error specifically.

For an understanding of the reasons which have impelled us to this conclusion, a somewhat more extended statement of the facts than that heretofore made becomes necessary. Most of the evidence to which we shall refer was given by members of the train crew called by the plaintiff as adverse witnesses and was uncontradicted save in immaterial details.

Five men made up the train crew—the engineer and fireman, Holzkamp, who was in charge of the switching and had general supervision of the crew, and two switchmen. Holzkamp and the two switchmen all carried lighted lanterns for signalling. Before reaching the crossing the engineer blew the whistle twice, the first time before the train came to the "whistle board" a few hundred yards south of State Street, and the second time when the lead car was about 400 feet from the crossing. The second whistle was blown as a signal to notify the people in the penitentiary that the train was approaching. According to the engineer and fireman and other witnesses, the engine bell was ringing from the time the train started from the Southern Pacific yard in Salem, a mile or less from the crossing, until after the accident. There was testimony of other witnesses who said that they did not hear the bell or could not remember hearing it, which possibly under our decisions would make an issue of fact on the question of whether the bell was ringing. We do not pass on the question since, in our view of the case, it is unnecessary to do so. On the front of the lead car was a fusee which gave a light visible for possibly a quarter

of a mile. Its glare reflected on the ground in front of it. The defendant Holzkamp was riding on the platform of the fourth car from the lead car. He got off the train when it stopped for the crossing, walked toward the crossing until he reached the front of the lead car, and waited there after the train started again until his car came by. Then he boarded it and resumed his place on the platform at the end farthest from the engine and on the side towards Salem. Thus, he had a view of traffic on State Street coming from the direction of the city. He described the accident as follows:

"Q. The field man, what did he do after he gave you the signal to come ahead?

"A. He stood there on the crossing until the first car came along, and then he got on it.

"* * *

"Q. Then what happened?

"A. The next thing, I noticed an automobile. And as we approached, I waved my lantern, to let him know we were out there. And I saw this second automobile coming. And I jumped off and ran to the road and waved at him violently, to let him know the road was obstructed.

"Q. Why did you jump off?

"A. To let him know the highway was obstructed. I was at the north edge of the highway.

"Q. While you were getting off and going to the north side of the highway, you were signaling all the time, were you?

"A. Yes. We weren't going fast. It was just two miles an hour.

"Q. Just the same, as you were jumping off, you were signaling this car?

"A. Yes.

"Q. And you got over to the north side, yourself, safely?

"A. Yes.

"Q. What occurred then?

"A. Well, after that the accident happened.

"Q. Tell these members of the jury what happened.

"A. Well, as I started for the north side of the highway, it appeared to me that he had slammed on his brakes, trying to stop. And he came up there with terrific speed, and hit the train."

The automobile struck the south end of the fourth car at just about the place where Holzkamp was standing before he jumped to the ground. The collision occurred at, or a little north of, the center of the highway.

It should be noted here that Holzkamp's testimony that the automobile came "with terrific speed" was stricken. There is abundant evidence, however, and it is uncontradicted, that the McKenzie automobile was driven at a very high rate of speed. In addition to the evidence of the skid marks, Holzkamp testified that it traveled 300 or 350 feet after it came into his view and about 200 feet after "I hit the ground", and that the speed of the car at the time that it hit the train was forty miles an hour; while A. W. Panther, a switchman who was riding the tender and had a view of the approaching automobiles, estimated McKenzie's speed at sixty miles per hour, and testified that the driver applied his brakes just as he came abreast of the first car.

The automobile which McKenzie passed stopped about ten feet from the train. It was driven away immediately and the identity of its occupant or occupants was never established.

The engineer, who occupied the seat on the left or Salem side of the locomotive's cab, did not see the

approach of the automobiles as he was a considerable distance back of the crossing and his view was obstructed by a building. He got a "washout" from Panther, the switchman riding the tender, and "big holed her" and stopped, railroad language for the signal for an emergency stop and compliance therewith. The engineer testified that it would take about three seconds to stop.

There is some evidence that the train stopped before the collision; some that it was in motion for eight or ten feet thereafter. All the evidence agrees that after the accident the railroad car which was struck was partly off the highway to the north of the crossing.

As State Street approaches the crossing from Salem it is straight for approximately 1,000 feet and is almost level. About 300 feet west of the crossing there was a highway reflector sign bearing the letters RR on either side of a cross, and at the crossing there was the conventional railroad crossing sign, a portion of which is reflectorized. The traffic on the highway at the time of the accident was very light. There is but little use of the spur track by the railroad company, and McKenzie, who was familiar with the crossing, testified that he had never before seen a train upon it. There was considerable evidence concerning obstructions—trees, shrubbery, buildings and the like—to the south of State Street, but these did not interfere with the view of the crossing and the train upon it.

As before stated, the night, while dark, was clear, there was no fog or haze, and the visibility was good. The pavement was dry.

The hog fuel cars were about forty-two feet long. Their tops were about fourteen feet from the ground. Four of them were painted a dark red, while the car

involved in the accident was partly so painted and partly the color of the natural wood.

The complaint contains seven charges of negligence against the defendants Southern Pacific and Holzkamp, which may be summarized as follows: Failure to keep a proper lookout, failure to have the train under proper control, failure to maintain a gate or provide any signal by mechanical device or otherwise to warn vehicular traffic, failure to station a flagman or other person at the crossing to warn vehicular traffic, failure to sound any warning by whistle, bell or otherwise of the approach of the train, failure to have a light or reflector on the train, and failure to exercise any care whatever for the safety of the traveling public.

■ The court withdrew from the jury's consideration all these charges except the failure to station a flagman at the crossing, and the jury resolved that issue in favor of the defendants Southern Pacific and Holzkamp. In our opinion there was no evidence to support any of the ·charges of negligence.

This is not a case of an automobile and a train simultaneously approaching a railroad crossing, as were *Doty v. Southern Pacific Co.,* 186 Or. 308, 207 P. 2d 131; *Case v. Northern Pacific Terminal Co.,* 176 Or. 643, 160 P. 2d 313; and *Fish v. Southern Pacific Co.,* 173 Or. 294, 143 P. 2d 917, 145 P. 2d 991, all relied on by the plaintiff. Here the train, moving slowly, occupied the crossing at a time when the McKenzie automobile was approaching it. Our most recent decision with respect to such a case is *Finn v. Spokane, P. & S. Ry. Co.,* 189 Or. 126, 214 P. 2d 354, in which the rules governing the liability of the railroad company are thus stated:

> "Under ordinary conditions a train on a railroad crossing is adequate notice of its presence,

and there is no duty to use flagmen, flares or other signals to warn a motorist of any danger, as it may be assumed that he will exercise due care to avoid injury (citing cases).

"A different rule would obtain, however, if the crossing under the existing conditions was unusually hazardous or dangerous. It would then be the duty of the railroad to use reasonable precaution to warn a motorist that a train blocked the highway. Whether reasonable care under such circumstances required the use of flagmen, flares or other signals would be a question of fact for the jury to determine (again citing cases). * * *

"How may it be determined whether a railroad crossing is hazardous or extrahazardous? In our opinion, if the railroad company through its operative employees could, under the existing conditions, reasonably anticipate that a motorist exercising due care in driving his automobile and having standard lights would nevertheless be likely to be injured by reason of the train blocking the highway, it can then be said that the crossing is extrahazardous or dangerous."

In the Finn case a judgment of nonsuit in favor of the railroad company was reversed because there was evidence from which it could be found that *under the existing conditions* the crossing was extra-hazardous and that the questions of negligence of the defendant and contributory negligence of the plaintiff should, therefore, have been submitted to the jury. But, except for the fact that the train was occupying the crossing as the automobile approached it, the Finn case bears very little resemblance to this one. The accident in the Finn case occurred at six-twenty o'clock on the morning of January 17, 1947, at the intersection of Northwest Vaughn Street and Northwest 22nd Avenue in Portland, Oregon. A train, consisting of an engine,

a box car, and a gondola car was facing south on 22nd Avenue, the gondola car blocking the intersection. The plaintiff driver was driving his automobile at fifteen miles per hour east on the right side of Vaughn Street en route to his work. The morning was dark and foggy and the plaintiff's visibility was only thirty to forty feet. The pavement was wet. When the plaintiff first saw the gondola car it was about fifteen feet away. He applied his brakes and skidded straight forward into it. The gondola car was dark-colored. The plaintiff was familiar with the crossing, had driven over it many times. A caution light, which he was accustomed to seeing, was completely obscured by the gondola car. The traffic on Vaughn Street was heavy at the time of the collision, while the spur track was rarely used. The length of time during which the train had been stopped on the crossing and the reason for its stopping did not appear in the evidence.

In this case there is no evidence whatever which would justify a finding that the railroad's employees should have anticipated that a motorist "exercising due care in driving his automobile and having standard lights would nevertheless be likely to be injured by reason of the train blocking the highway". As contrasted with the Finn case, the evidence here is that, although it was a dark night, there was no fog or haze, the pavement was dry, and no caution light was obscured. There is no evidence as to how far from the crossing McKenzie was when he first saw the train; there is evidence, differently from the Finn case, that he was driving at an excessive rate of speed; and there is evidence that another motorist, presumably driving at a lawful rate of speed and having lawful lights, saw the train and was able to stop his automobile in time

to avoid an accident, although he preceded McKenzie along State Street to a point to within 300 or 350 feet of the crossing.

If it should be said that the first motorist was able to avoid a collision because he saw Holzkamp's light and not the train—and this is purely conjectural—the result would be the same because in that event, even on the theory that this was an extra-hazardous crossing, the railroad would have complied with its duty to give some other warning than the presence of the train itself.

■ We think, however, that this is a case to which should be applied the rule that a train on a railroad crossing is adequate notice of its presence and no duty rested upon the defendants Southern Pacific and Holzkamp to give any additional warning to motorists by flagman, flares, or other signals.

It results from the foregoing that the judgments in favor of the plaintiff against the defendant McKenzie and in favor of the defendant Southern Pacific and Holzkamp are affirmed.