Argued February 26, reversed March 12, 1952

## SCHUKART *v.* GEROUSBECK

241 P. 2d 882

*John Gordon Gearin,* of Portland, argued the cause for appellant. With him on the brief were Koerner, Young, McColloch & Dezendorf, and Oglesby H. Young, all of Portland.

*Brazier C. Small,* of Salem, and *Bruce Spaulding,* of Portland, argued the cause and filed a brief for respondent.

## TOOZE, J.

This is an action by John Schukart, as plaintiff, against P. C. Gerousbeck, E. E. Bentley, and Dale Fields, as defendants, to recover damages for personal injuries alleged to have been caused by defendants' negligence. The jury returned a verdict in favor of defendants Bentley and Fields, and for the plaintiff against defendant Gerousbeck in the sum of $2,000. Judgment was entered accordingly, and defendant Gerousbeck appeals therefrom.

The evidence discloses that the Southern Pacific Company, hereafter called the Company, operates a branch railroad line which runs generally in an easterly and westerly direction between the city of Salem and Mill City. Salem is located in Marion county, upon the banks of the Willamette river; Mill City is situated in an extensive logging district in said county, about 40 miles south-easterly from Salem. Upon the railroad line in question, the Company operated logging trains, there being six scheduled runs each day. Logs are transported from Mill City to Salem, where they are dumped into the Willamette river and there held for further disposition.

As this railroad line leaves the city of Salem, it runs through an open, flat, farming section for a distance of several miles. About two miles easterly from Salem, it intersects a county road known as "Lancaster drive", at right angles and at grade. Lancaster drive runs in a general northerly and southerly direction. It is a paved highway having a black-top

surface. For a mile or more, both north and south of the railroad crossing, the highway runs in a straight line. There are no buildings, trees, or other obstructions to view, within many hundreds of feet in all directions from the crossing. On the approach to the crossing from the north, and on the right hand side of the road some little distance north of the railroad, there is located a standard railroad-crossing sign erected by the public authorities; near to the crossing, there is the customary cross-arm warning sign erected by the Company.

On Saturday, March 13, 1948, at about 11 p. m., the Company was operating a train consisting of a locomotive, 39 empty logging flat cars, and a caboose, in an easterly direction along said railroad line. The movement started at Salem, and the destination of the train was Mill City. Defendant Gerousbeck was the conductor; defendant Bentley, the fireman; and defendant Fields, the engineer, on the train. Defendant Gerousbeck was riding in the caboose and, at the time of the accident, was engaged in work on his reports. The over-all distance from the front of the locomotive to the rear end of the caboose was approximately 1,750 feet.

A logging flat car is slightly over 44 feet in length. The trucks consist of four wheels at each end of the car. From the rail to the top of the car, the distance is 3½ feet. The top consists of a center metal sill running the length of the car, and being approximately 20 inches in depth and width. At each end is a cross-arm of metal extending on each side of the center sill for the width of the car. It is upon these cross-arms that the logs are laid when the car is being loaded. The cars are painted a red or maroon color.

On the night in question, plaintiff was operating

his 1935 Oldsmobile automobile in a southerly direction on Lancaster drive toward the railroad crossing. Accompanying him were a Mr. and Mrs. Smith. At the crossing, plaintiff's automobile collided with the nineteenth car of said logging train. As the result of such collision, plaintiff suffered certain personal injuries, for which he commenced this action to recover damages.

Plaintiff by his amended complaint charged defendants with the following acts of negligence:

"(1) They so obstructed said highway with said empty logging flats notwithstanding they then and there knew, or in the exercise of reasonable diligence could have known, that said empty logging flats and said train could not be seen by motorists traveling along said highway, at reasonable rates of speed, their cars equipped with proper lights and being carefully operated.

"(2) They failed to give any warning whatsoever to plaintiff of the approaching train or of the obstructing of said highway at said crossing, notwithstanding they knew, or in the exercise of reasonable diligence could have known, that said unusually dangerous situation existed at said crossing.

"(3) They failed to keep a proper lookout for vehicles traveling upon said highway and approaching said crossing.

"(4) They then and there so obstructed said highway at said railway crossing when they knew, or in the exercise of reasonable diligence could have known, that there was not installed at said crossing any wigwag system or bell system to warn motorists approaching said crossing of the presence of said train and empty logging flats."

In their answer, defendants denied the specific acts of negligence charged against them and by way of an

324

affirmative answer and defense charged plaintiff with certain acts of contributory negligence as follows:

"(1) He operated his automobile at a speed greater than was reasonable or prudent under the circumstances then and there existing.

"(2) He failed to maintain proper or any lookout and particularly failed to look out for or see the train which was at all times upon the crossing and which was plainly visible to him had he looked.

"(3) He failed to keep his automobile under proper or any control so as to be able to slow down, stop or avoid running into the train of defendants.

"(4) He failed to have his said automobile equipped with proper or adequate headlights lighted thereon, so aimed and of such intensity as to reveal persons or vehicles on the highway at a distance of at least 100 feet ahead of his automobile.

"(5) He failed to slow down as he approached said crossing with which he was thoroughly familiar.

"(6) He failed to stop.

"(7) He failed to yield the right of way to the train.

"(8) He failed to listen as he approached the crossing."

By his reply, plaintiff denied the new matter alleged in the answer.

It was upon the issues thus formed that the action was tried. Upon the conclusion of the evidence, and when both sides had rested, defendants moved the court for a directed verdict in their favor as follows:

"At this time, if the Court please, the defendants and each of them move the Court for an order directing the jury to return its verdict in their favor and against the plaintiff on the ground and for the reason that there is no evidence that the defendants or any of them were guilty of negligence in any particular charged in the Amended Complaint, or that any act of omission on their

part constituted the proximate cause of the accident. It further appears that the plaintiff was guilty of contributory negligence as a matter of law in one or more of the specifications as charged by defendants, which negligence constituted the proximate cause of the accident. In that I call the Court's attention to the admission of the plaintiff that he was not listening."

The trial court denied the motion and allowed an exception. In submitting the case to the jury the trial judge took from consideration specification numbered 1 of the specifications of negligence charged against defendants, and also specification numbered 3 as applied to the defendants Bentley and Fields. After the verdict against the appealing defendant had been returned and entered, said defendant moved the court for a judgment in his favor notwithstanding the verdict. This motion was denied.

Defendant on this appeal sets forth 14 assignments of error. The first assignment is based upon the refusal of the court to grant the motion for a directed verdict on the ground that there was no evidence of negligence on the part of defendants. The second assignment of error is based upon the trial court's refusal to hold plaintiff guilty of contributory negligence as a matter of law. The third and fourth assignments relate to the court's failure to grant motions for a mistrial based upon the production of alleged immaterial and prejudicial evidence, and upon improper argument of counsel. The fifth assignment concerns alleged error in the giving of a certain instruction to the jury. The remaining assignments apply to certain requested instructions that the court failed and refused to give to the jury.

■ We shall confine our attention to the first assignment of error, as the conclusion we have reached

respecting it is decisive of this case. Upon a motion for a directed verdict against the plaintiff, it is the law that, in reaching a decision, the court is required to consider the testimony in the light most favorable to him.

It is defendant's contention that the railroad crossing in question was not an extra-hazardous crossing within the meaning of the law, and that being so, there was no evidence establishing or tending to establish any negligence as charged in the amended complaint. It is his position that the court should declare as a matter of law that the crossing was not an extra-hazardous one. Plaintiff, to the contrary, insists that the question is one of fact for the jury to determine under all the facts and circumstances of the case. It was so submitted to the jury by the trial court. By its verdict the jury found that issue in favor of plaintiff.

It is obvious that, if the crossing was not extra-hazardous, plaintiff would not be entitled to recover, because all of his allegations of negligence rest upon the theory that an extra-hazardous condition existed. It follows, therefore, that if that condition did not exist, there was no negligence on the part of anyone connected with the train or its operation.

The evidence shows that on the approach of the train to the crossing the whistle on the locomotive was blown and the bell was rung. Plaintiff heard neither, but that is understandable in the light of the the weather conditions to which plaintiff testified, and also the distance plaintiff's car, with all its windows closed, was from the crossing when the locomotive approached and crossed over the crossing.

In outlining the facts of the case, we deem it unnecessary to review the evidence having a direct bear-

ing upon the alleged contributory negligence of plaintiff. We shall confine ourselves to those facts directly relating to the question of whether or not the crossing was extra-hazardous.

In stating the facts in his brief, it is to be assumed that plaintiff set them forth in the light most favorable to his own position. For that reason, we adopt the same, with few exceptions, as our statement of the case. In plaintiff's brief it is stated:

"The night of the accident, March 13, 1948, was one of those nights that are sometimes experienced in the Willamette Valley, when gusts of wind blow the rain about and rain was falling tremendously hard at places, and short distances away rainfall was reasonably light, and heavy rainfall was intermittent. * * *

"This situation is revealed by the following testimony:

"Plaintiff Schukart testified: 'it was storming very hard and it was awfully dark. * * Raining and blowing.'; and when asked about his ability to see, said 'It was raining too hard. You couldn't see anything very far in front of you.'; 'it was an awfully dark night, with the rain * * Well, it was out of the ordinary, I think. I would say out of the ordinary, with the darkness and the amount of rain. There was the darkness and the rain. It was a stormy night, an exceptionally stormy night.'

"Witness Oakley McCreight testified: 'it had been raining awfully hard'; and also said 'I don't remember at the exact time; but I know it had been raining. It was not raining when we went into Madsen's (a restaurant in downtown Salem), and when we came out the water was running off the buildings and gutters; it had rained awfully hard. * * I know it was stronger than it usually is at that time of night—more than average'; and said 'Well, you couldn't see very far, I know. It was very dark.'

"State police officer James Hamer testified that when he received the call with reference to the accident he was 'About a mile and a half or two miles' from the scene of the accident, and that at that time and place 'In the vicinity where we were it was raining quite hard. * * it had been a gusty evening. It would blow, and die out, and blow and die out. * * it was a good dark night.'; but by the time he and his fellow officer arrived at the scene of the accident 'the heavy downpour had diminished and it was a fine rain'; he said it took them about six minutes from 11:04 to 11:10 to travel to the scene * * *.

"Witness Grindle testified that just before he arrived at the scene of the accident 'it had been raining hard * * it had been a gusty evening'.

"State officer Van Keuren testified that when he received the call about the accident 'It was raining; raining quite hard * * I remember it was a gusty wind' and that by the time they arrived at the scene 'it had stopped raining considerable. It was misting, but it was still blowing a little,' the highway was wet; and said that after they 'came to the scene of the accident' they ran out of the shower, and said 'it did rain often and then the wind would hit often that evening, earlier'.

"Witness Alice M. Smith testified 'It was a terribly bad night * * It seemed like when the gusts of wind would come they would just practically sway the car', and said that they could hear the wind blow 'and the spells of rain were just terrific. And just before the crossing there was some of those spells'.

"'* * * F. S. Main, the man in charge of the United States Weather Bureau, located 'a mile and a half or so from the scene of the accident' said that up till 9:22 that evening it happened that at the place where he was there was only a 'total rainfall of .03 of an inch', but said that they had no 'other reports after 9:22'; and also said it was possible that 'you might have one situation at your

place and another situation in another place in the vicinity'.

"The testimony as to the type of highway was as follows:

"Plaintiff Schukart said 'It was black hard top surface * * It was smooth top then'.

"State police officer James Hamer said the highway was wet 'It was shiny black. It hadn't been resurfaced, and it was quite shiny and like old black-top gets in the rain'.

"State Officer Van Keuren said 'It was an oiled highway, black in color, and it had water on it * * it was quite smooth'.

"With reference to it being a heavily traveled highway, state officer Van Keuren said 'There was a considerable number of cars that did stop at the accident after it happened, and there were a few going back and forth * * as a secondary high-way, I would say that it had considerable traffic on it, yes'.

"The evidence showed that no other car approached the crossing from the train's left excepting respondent's car. Also the evidence showed the approximate speed of the train, the approximate speed of the automobile, and the fact that by the time the accident occurred the locomotive and 19 cars * * * had crossed the crossing."

From this statement of the evidence, and the other facts to which reference has been made, it is plain that plaintiff's contention that this particular crossing was extra-hazardous is necessarily based upon the fact that it was very stormy that night, with a heavy rain falling and the wind blowing quite hard; a more or less typical rainy, blusterous night, so common to most parts of this state and particularly to the Willamette valley, during some of the winter months. It is noted that, although there is some evidence in the record that there were low-hanging clouds over the

scene of the accident, there is no evidence, nor is any claim made, that there was any fog.

Upon such a night as is depicted by the evidence in this case, automobile driving is extremely difficult and more or less hazardous, because of limited visibility. This is especially true on paved black-top highways. Of course, such conditions demand a higher degree of care on the part of the automobile driver for his own safety than is ordinarily required.

■ It is manifest that this crossing, located as it is in flat, open country, with no obstructions to view, and provided with the usual railroad crossing warning signs, did not constitute an extra-hazardous crossing within the meaning of the rules established by a long line of decisions by this court. Did the stormy conditions described render it extra-hazardous at the time? That is the question for decision in this case. We must bear in mind the fact that the railroad itself is a warning of danger, as is a moving train, or one at a stop which blocks the crossing.

We have held in some of our prior decisions that whether or not the railroad crossing involved was extra-hazardous was a question of fact for the jury to determine. In other cases we have held that the question was one of law for the court to decide. In each of the decisions the final conclusion rested upon the peculiar facts and circumstances present in that particular case. We have uniformly held that, if the crossing is extra-hazardous, the railroad company is required to take extra precautions for the protection of travelers along highways intersecting the railroad. In most, if not all, of those cases, the question of what sort of precautions were necessary and proper under the circumstances was deemed a matter for jury determination, based upon the pleadings and the evidence.

It would unnecessarily prolong this opinion for us to review again all of our prior decisions dealing with the question now under consideration. In *Fish v. Southern Pacific Co.*, 173 Or 294, 143 P2d 917, 145 P2d 991, Mr. Justice HAY, in writing the opinion of the court, thoroughly discussed and analyzed most of the decisions of this court rendered prior thereto. In *Case v. Northern Pacific Terminal Co.*, 176 Or 643, 160 P2d 313, the late Chief Justice BELT again gave consideration to the subject. The latest decision involving this matter is that of *Rogers, Adm'r., v. Southern Pacific Company et al.*, 190 Or 643, 227 P2d 979. In all the cases where the question of whether or not the railroad crossing was extra-hazardous was deemed a jury question, unusual conditions existed; such as impaired visibility because of fog, combined with other facts; peculiar traffic hazards on a heavily traveled street in a city; obstructions to view; or other very uncommon circumstances. For example, see *Finn et al. v. Spokane, P. & S. Ry. Co.*, 189 Or 126, 214 P2d 354, 218 P2d 720; also, same case, second appeal, this day decided.

In the *Rogers case,* supra, the automobile driver had driven his car into the side of the train. The railroad crossing in that case was located on State street near the state penitentiary, immediately east of the east city limits of the city of Salem. Railroad traffic over said crossing was comparatively infrequent. There was considerable evidence concerning obstructions to view—trees, shrubbery, buildings, etc. About 300 feet west of the crossing there was a highway reflector sign bearing the letters "RR" on either side of a cross, and at the crossing there was the conventional railroad crossing sign. These signs are similar to those mentioned in connection with the instant case. The

accident occurred just after midnight. It was a dark night, but there was no haze or fog, the pavement was dry, and visibility was good.

In that case charges of negligence somewhat similar to those made against defendants in the instant case were made against the defendant railroad company. In referring to those charges of negligence, Mr. Justice Lusk, speaking for the court, at page 658, said:

"The court withdrew from the jury's consideration all these charges except the failure to station a flagman at the crossing, and the jury resolved that issue in favor of the defendants * * *. *In our opinion there was no evidence to support any of the charges of negligence.*" (Italics ours.)

This conclusion necessarily was based upon a determination by the court that the crossing in question was not extra-hazardous as a matter of law. Normally, the crossing involved in that case would be deemed much more hazardous than the one under consideration here. Infrequency of railroad traffic over the crossing, location on State street (one of the busiest thoroughfares running through and out of the city of Salem), and obstructions to view would render it so. But in that case, as we noted, the pavement was dry; there was no fog or haze; visibility was good. In contrast, here we have heavy rain and strong winds, with visibility poor.

Hence, as before indicated, the question is now squarely presented whether such weather conditions as existed here rendered this otherwise ordinary country railroad crossing extra-hazardous, either as a matter of fact or of law.

■■ We are of the opinion that they did not. There is nothing in our prior decisions to justify a holding that they did. In the light of weather conditions so

common to this section of the state during the winter months, of which this court will take judicial notice (§ 2-502 (8), OCLA; *Blackford v. Boak,* 73 Or 61, 65, 143 P 1136), to hold that rain and wind alone might render a railroad crossing extra-hazardous would amount to an arbitrary and unreasonable extension of the rule that ordinarily the question is one of fact for a jury to determine. Such a rule would require a railroad company, during the rainy season of the year, to install a warning bell, station a flagman, or to take other similar precaution at every country railroad crossing. It would slow down and seriously impede railroad traffic. It would be equivalent to placing the railroad train on the same footing as the automobile, even though the train is confined to the rails.

The interest of the public in the continuous, uninterrupted, and unobstructed operation of a railroad is at least equal, if not paramount, to its interest in highway use. Public policy has always demanded, and now does demand, that a railroad company be permitted to carry on its functions as a common carrier without unreasonable and unnecessary interference which will slow up, interrupt, or obstruct traffic.

We have uniformly drawn a distinction between railroad crossings over busy streets in a city and those located in the country. If it be desirable that railroad companies be required to adopt extra precautions at every country crossing during the rainy season, the matter should be addressed to the legislature, not to the court.

We hold therefore, as a matter of law, that the railroad crossing involved in this case was not at the time and extra-hazardous crossing, and that the precautions alleged in the amended complaint as necessary and as having been omitted were not required. Hence,

there was no negligence on the part of the railroad company, nor could there be any on the part of the defendant. Having reached that conclusion, it becomes unnecessary for us to discuss the question of whether or not the defendant, as conductor on the train, could be held liable in any event under the facts of this case.

This disposition of the case also renders unnecessary a consideration of the other assignments of error. The motion for a directed verdict in favor of defendants should have been sustained.

The judgment is reversed and the cause remanded with directions to enter judgment in favor of defendant.