Argued May 21, reversed September 10, 1953

# SPENCER *v.* SOUTHERN PACIFIC COMPANY

260 P. 2d 956

*Oglesby H. Young,* of Portland, argued the cause for appellant. With him on the briefs were Koerner, Young, McColloch & Dezendorf and John Gordon Gearin, of Portland.

*U. S. Balentine,* of Klamath Falls, argued the cause and filed a brief for respondent.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, TOOZE and PERRY, Justices.

WARNER, J.

This is an action brought by George Sheridan Spencer against the Southern Pacific Company, a corporation, to recover damages for injuries sustained in a collision between an automobile driven by him and defendant's freight train at a country road crossing on defendant's main line about four miles south of the city of Klamath Falls in Klamath county, Oregon. At the conclusion of the trial, both parties moved for directed verdicts. The court thereupon took the case from the consideration of the jury and rendered a judgment in favor of plaintiff, from which the defendant railroad appeals.

Defendant's track runs straight in a general northerly and southerly direction for a mile to the north of its intersection with the country road and, likewise, for a mile and a quarter to the south of it. The presence of the crossing was denoted by standard crossarm warning signs appropriately located on each side of the track. No other warning devices were employed.

At the point of the accident the railroad is crossed by a country road, then graveled and known as the Joe Wright road. This runs in a general easterly and westerly course in a straight line for a considerable distance on the easterly side of defendant's track and from that direction approaches the railroad at an angle of approximately 60 degrees.

Open and level fields characterize the terrain lying between the country road and the track. No structures impede vision except a barn located about an eighth of a mile from the crossing and at some distance south of the highway, nor is there vegetation or other objects to obstruct a driver's view of the track at any point on the road for a long distance east of the crossing. Notwithstanding, plaintiff testified that he did not see the train until he "got just exactly on it" and further claims that he at no time saw the warning crossarms, although they were visible to his witness Roach, a state police officer, when he was 200 feet back on the roadway.

The level of the railroad track was above the general level of the road and, therefore, to cross the track from the east to the west, the highway went up an incline which began somewhat back from the railroad right of way until it attained a crossing at the track level. It is the pitch or level of this incline which captures our attention and which becomes the decisive

element in this matter. Plaintiff estimated that the incline began about 75 feet back from its high point on the track and in that distance rose about seven feet above the general level of the road. The railroad company, on the other hand, contends that the roadway started to rise about 550 feet east of the crossing and in that distance very gradually attained an elevation of eight feet above its beginning point, giving it as it progressed westward a "smooth", as contrasted to a sharp, rise in grade for its entire length.

The collision occurred on the evening of May 11, 1950, about 10:25 p. m., standard time. The night was dark and the weather was clear. There was no moonlight but, according to some witnesses, the stars were shining.

Shortly before the accident, defendant's train was moving in a northerly direction propelled by a diesel engine. It was traveling at a speed of 45 miles an hour. The train consisted of box cars, flat cars and gondola cars, numbering a total of 97 units including the engine and caboose, and was three quarters of a mile to a mile long. The greater part of its length had passed the crossing when the front of Spencer's automobile hit head-on between two flat cars which were the 17th and 18th cars from the rear.

Spencer lived some distance to the east of the crossing. He was employed on the night shift in a plywood mill located west of defendant's railroad and, by reason of these facts, was familiar with the crossing, having passed over it ten times a week for more than a year prior to the accident, enroute to and from his place of work. Indeed, he was returning alone to the plywood mill to resume his duties there when the accident occurred. He was driving westerly along the Joe

Wright road at a speed of 25 to 30 miles an hour. Knowing he was approaching the crossing, he reduced his speed to 20 miles and was traveling at that rate or a little less when he struck the train. He says he looked to the right and left as he neared the crossing and listened for the train but heard no signals or other noises of the kind made by the passage of a train in normal movement. His failure to hear the train may be explained by the fact that his windows were up. It is also worthy of note that he did not apply his brakes before the collision.

Plaintiff charges that the railroad company was negligent in the following particulars: (1) it maintained its track at such an elevation as to nullify the beneficial effects of the headlights on plaintiff's automobile; (2) it so arranged its freight cars as to preclude the reflection of headlights from cars approaching the crossing, particularly those on plaintiff's car; (3) it failed to establish and maintain automatic signal devices which would warn the public of the presence of a train upon the crossing; (4) it failed to place a signalman at the crossing to signal the place of said crossing; and (5) it failed to install and maintain upon the cars of its train reflectors designed to reflect the headlights of plaintiff's automobile.

It is manifest from the charges which plaintiff lays against the defendant railroad, and emphasized by the evidence adduced at the trial, that plaintiff rests his action solely upon the theory that the railroad crossing was of an extrahazardous character at the time of the accident.

The plaintiff at the trial, in ascribing his reason for the cause of the accident, in effect waives the last four allegations of negligence and asserts that the

real cause of the collision was incident to the elevation of the defendant's track and the incline which the highway followed in approaching it. This is, in essence, his first charge of negligence as enumerated above.

Concerning this, Spencer testified:

"Q. Can you tell us why you did not see the train until you were right on it?

"A. *Because of that short incline,* and it was awful dark that night; no moonlight * * * that you could not distinguish anything. Your headlights would not hit that until you got on the incline." (Italics ours.)

We, therefore, accept the gauge of the hazardous character of the crossing as thus claimed by plaintiff, i.e., that the pitch of the incline of the highway as it approached defendant's track was of such a degree that it rendered plaintiff's automobile headlights useless in detecting the presence of the train on the track and, ipso facto, endowed the crossing with the extrahazardous quality asserted by Spencer.

■ The gist of plaintiff's reason for the cause of the accident is tantamount to saying that if the incline had not been as steep as he claimed it was, then the collision would have been avoided, notwithstanding the absence of the other safety devices to which plaintiff refers in his last four allegations of negligence. A further reason for narrowing our inquiry to the proposition advanced by the elevation of the track and the angle of the incline of approach is that we are satisfied there is not sufficient evidence, and in most instances no evidence, to sustain any of the other charges of negligence. Indeed, if we were not confronted with the necessity of giving consideration to the evidence relating to plaintiff's first charge of negligence, we

would have no hesitancy at this juncture in resolving this appeal in favor of the appellant railroad on the authority of *Schukart v. Gerousbeck,* 194 Or 320, 241 P2d 882, and *Rogers, Adm'r v. So. Pac. Co. et al.* 190 Or 643, 227 P2d 979.

The ultimate answer as to whether a given crossing is hazardous or nonhazardous is dependent upon the facts and circumstances peculiar to the particular case then in court. *Schukart v. Gerousbeck,* supra, at 330. As an aid in this determination, we have held that if a railroad company through its operating employees could under the existing conditions reasonably anticipate that a motorist exercising due care in driving his automobile and having standard lights would, nevertheless, be likely to be injured by reason of the train blocking the highway, it can then be said that the crossing is extrahazardous or dangerous. *Finn et al. v. Spokane, P. & S. Ry. Co.,* 189 Or 126, 134, 214 P2d 354, 218 P2d 720.

When we apply the foregoing rule from the Finn case, it projects this question here: Was the approaching incline in the highway of such angle as to quicken in the minds of the company's employees a reasonable apprehension that traveling, as Spencer was on the night of the collision, one might collide with a passing train in the absence of any of the safety devices which plaintiff claims were not present at the situs of the accident?

The headlights on Spencer's car were standard and on high beam and enabled him to see a man 200 feet ahead of him in the roadway. We note that his estimate of the incline's rise as seven feet within a distance of 75 feet thereby produced a grade of nearly 10 per cent within a relatively short distance.

However, whatever benefit the plaintiff may claim for his own estimate of the angle of elevation of the highway, and which is the most favorable testimony bearing on that subject, it must give way to evidence in the record which clearly demonstrates that it is contradictory to certain incontrovertible physical facts. *Van Zandt v. Goodman et al.,* 181 Or 80, 83, 179 P2d 724. This latter evidence, objective in character, was introduced without objection and establishes beyond peradventure that the angle of the approaching incline is not one of the extreme pitch contended for by plaintiff but, on the contrary, is of such slight elevation and the length of the incline is of such gradual approach that it nullifies any suggestion that it thereby created an extrahazardous element in the crossing. The effect of this is to leave plaintiff's case devoid of any evidence whatever which would justify a finding that the railroad's employees should have anticipated that a motorist "exercising due care in driving his automobile and having standard lights would nevertheless be likely to be injured by reason of the train blocking the highway." *Finn et al. v. Spokane, P. & S. Ry. Co.,* supra, at 134.

What was said by Mr. Justice Tooze in *Schukart v. Gerousbeck,* supra, at 333, we think may be appropriately repeated here in conclusion:

"The interest of the public in the continuous, uninterrupted, and unobstructed operation of a railroad is at least equal, if not paramount, to its interest in highway use. Public policy has always demanded, and now does demand, that a railroad company be permitted to carry on its functions as common carrier without unreasonable and unnecessary interference which will slow up, interrupt, or obstruct traffic."

The observation there made attains additional force and cogency when claims of negligence arising from crossing mishaps are laid against a railroad by persons who were as long and as intimately familiar with the crossing as was the instant plaintiff.

The judgment of the circuit court is reversed.