Argued November 6, affirmed December 29, 1972, petition for
rehearing denied February 13, 1973

SARGENT, *Appellant, v.* SOUTHERN PACIFIC
TRANSPORTATION COMPANY, *Respondent.*

504 P2d 729

*John Gordon Gearin,* Portland, argued the cause for appellant. With him on the brief were Davis C. Landis, and Gearin, Landis & Aebi, Portland, and Anderson, Richmond and Owens, Eugene.

*James H. Clarke,* Portland, argued the cause for respondent. With him on the brief were Robert E. Maloney, Jr., and McColloch, Dezendorf, Spears & Lubersky, Portland.

Before McALLISTER, Presiding Justice, and

DENECKE, HOLMAN, TONGUE, HOWELL, and BRYSON, Justices.

HOLMAN, J.

Plaintiff is the administrator of the estate of both Diane and Douglas Sargent, husband and wife, who were killed in a collision at a railroad crossing between an automobile, driven by Douglas, and defendant's freight train. Plaintiff filed a separate case for damages for the death of each decedent and the two cases were consolidated for trial. Plaintiff appealed from judgments of involuntary nonsuit given at the completion of plaintiff's cases in chief.

The principal issue is whether the crossing was extrahazardous. The issue is raised in different ways by several assignments of error, but whether prejudicial error was committed is determined by the manner in which this court disposes of the principal issue.

The accident occurred at night, a few miles north of Eugene, where defendant's main line intersects Meadow View Road at approximately a right angle. Plaintiff's decedents were traveling west, the train north, at the time of the accident. Both the road and the train track are straight for a considerable distance each side of the crossing. The view is completely unobstructed by trees, buildings, or anything of similar nature. The land is perfectly flat. Plaintiff's decedents, as they approached the crossing from the east, were faced first with a railroad crossing sign installed by the county and then by an unreflectorized cross buck at the track. There is no evidence of the distance of the county sign from the track, but the parties seem to assume, and the case was tried, as if

the distance was 275 feet. Pacific Highway 99-W parallels the train track at a distance of approximately three quarters of a mile to the west.

The vehicle in which plaintiff's decedents were riding struck the side of defendant's train while the train was being operated at 35 miles per hour, and it hit the coupling between two box cars which were the 22nd and 23rd units of a freight train of 102 cars pulled by two locomotives.

The atmospheric visibility was good except for spots of patchy ground fog, but there was no evidence of any such fog upon the road to the east of the track at the time of the accident. Plaintiff strenuously contends there was evidence of fog, but a careful examination of all the evidence discloses the contrary. The engineer of the train testified there was occasional patchy fog, but he said Meadow View Road was clear to the east of the track. A deputy sheriff said he ran into fog on his way to the scene of the accident as he approached the crossing from the west. However, this must have been at a time considerably later than the accident, because he said the ambulance was already there by the time he arrived. The first person to arrive at the scene of the accident was a resident who lived a quarter of a mile to the east of the crossing who heard the impact and went immediately to the scene in his automobile. He testified the visibility was clear when he approached the track from the east.

Pictures taken the same evening, after the accident, indicate the surface of the road was almost dry with only a few small damp spots. Two parallel skid marks were shown to lead to the track from the east. There is no evidence of their length, but the case was tried as if they were 175 feet long. The desig-

nated speed for Meadow View Road was 55 miles per hour.

A former Public Utility Commission investigator, who investigated the accident for the Commission, and a civil engineer with experience in grade crossings, who examined the crossing shortly before trial, both testified, in effect, that in their opinion the crossing was extrahazardous.

■ Whether a crossing is extrahazardous is not determined by the opinion of a witness, expert or otherwise, but by whether the crossing at the time of the accident met the requirements of such a crossing as specified by the opinions of this court. The important factor is not whether the witnesses have an opinion that the crossing is extrahazardous but, rather, the reasons they give for such an opinion.

The Public Utility Commission investigator gave the following reasons for his conclusion:

1) the designated highway speed;
2) the observed speed of vehicular traffic on Meadow View Road;
3) the amount of train traffic over the crossing (25 trains per day);
4) the allowable speed for trains at that location (70 miles per hour for passenger; 60 miles per hour for freight);
5) the lack of contrast between the background and the train during nighttime hours;
6) the accident record between trains and vehicles (there was no evidence of any such record for this crossing);
7) the lack of striping down the center of the highway which allowed vehicles to overtake and to pass other vehicles at the crossing;
8) the angle of the crossing (80 degrees);
9) the lack of illumination at the crossing;
10) the lack of illumination of the train;

11) the adverse weather in Oregon during the wintertime resulting in poor visibility and stopping conditions;

12) people who use crossings regularly are inclined to ignore them;

13) the visibility was so good that drivers of vehicles would not be inclined to look carefully;

14) the absence of white clearance marks requiring vehicles to stop at least ten feet from the track;

15) the advance crossing sign (installed by the county) was too small and too close to the track;

16) the absence of railroad warning markers on the roadway in advance of the crossing.

The civil engineer testified that, in his opinion, the crossing was extrahazardous only at night. He enumerated the factors upon which his opinion was based as follows:

1) the lack of illumination at the crossing;

2) the lack of protective gates to keep automobile traffic off the crossing while trains were passing;

3) a false horizon visible above the train created by the lights of vehicles using Pacific Highway 99-W in the distance which gave the impression that there was nothing between the driver of a vehicle approaching from the east and Pacific Highway 99-W.

An extrahazardous crossing has been defined by this court as being one which is so dangerous that a reasonably prudent motorist cannot safely use it unless the railroad takes measures in excess of those usually taken to warn motorists.[1] If a crossing is not extrahazardous the railroad owes no duty to a motorist to put out flags, or to put up automatic gates, lights, or

[1] Mills v. Dunn Bros., 264 Or 156, 503 P2d 1250 (1972); Brown v. Spokane P. & S. Ry. Co., 248 Or 110, 117, 431 P2d 817 (1967).

other protective or warning devices not normally used at grade crossings. In determining the kinds of danger which must exist to qualify a crossing as being extrahazardous, this court has principally relied on factors which usually, but not always, revolve around the impairment of the motorist's view of the train. These factors usually fall within three categories:

1) the adverse physical condition of the terrain;
2) bad weather;[2]
3) conditions which tend to distract the motorist's attention.

A consideration of the factors enumerated by the experts reveals that some of the factors involve the lack of various warning devices which are required only if a crossing is extrahazardous. All but one of the other factors either were not present at the time of the accident or are not of the kind which this court has held to be sufficient to classify a crossing as being extrahazardous.

One of the alleged factors, the claim that a false horizon was created by the lights of the vehicles using Highway 99-W, deserves comment. The witness testified that such a condition was created because the lights were visible *above the train* by motorists approaching the crossing from the east on Meadow View Road. If this were a fact, we doubt it would be sufficient to make the crossing extrahazardous. However, we do not have to decide the question because the testimony is incredible when it is considered in connection with the extensive pictures of the terrain, which are in evidence. The pictures show an exactly level

[2] Bad weather conditions alone have been held to be insufficient. Schukart v. Gerousbeck, 194 Or 320, 332, 241 P2d 882 (1952).

terrain and reveal how physically impossible it would be for a motorist approaching the crossing from the east to see over the top of box cars the lights of vehicles on Highway 99-W. If anything, such lights would form a background which would be interrupted by the passing of railroad cars, thus acting as a warning to motorists.

■■ As we previously indicated, plaintiff also urges there was evidence of fog which impaired the decedents' view. There is no such evidence. As a whole, the evidence indicates about as visible and nonhazardous a country crossing, except for darkness, as it would be possible to find. We recognize that all grade crossings constitute some hazard. The utility of railroads and the relative difficulty in controlling and maneuvering a train as compared with an automobile have caused the law to give railroads a position of preference. It may be that the law will someday be re-evaluated in light of changing conditions and values. Neither this court nor the trial court was invited to make such a re-evaluation in this case. Until re-evaluation comes, the railroad owes no duty to motorists to give a warning, in addition to that given here, of the train's presence on the track in the absence of an extrahazardous crossing.

■ Plaintiff also contends the trial court committed error in failing to allow plaintiff to introduce as evidence the engineer's comment to one of plaintiff's investigators that the crossing was a "bad one" and should be further protected. We do not have to answer this contention because, assuming the evidence was admissible, this court's determination that the crossing is not extrahazardous would not be changed.

The judgment of the trial court is affirmed.

TONGUE, J., dissenting.

As stated by the majority, the principal issue between the parties on this appeal is whether this railroad grade crossing was "extra hazardous," as previously defined by this court to mean one which is so dangerous that a reasonably prudent motorist cannot safely use it unless the railroad takes measures in excess of those usually taken to warn motorists—in this case by the erection of a wooden "cross-buck" sign.

It is equally well established, however, that whether a particular railroad crossing is extra-hazardous depends upon conditions existing there at the time of the accident and that a crossing can be extra-hazardous temporarily or from time to time, as conditions may change. *Rogers, Adm'r. v. So. Pac. Co. et al*, 190 Or 643, 659, 227 P2d 979 (1951); *Fish v. Southern Pacific Co.*, 173 Or 294, 302, 143 P2d 917, 145 P2d 991 (1944); *Finn et al v. Spokane, P. & S. Ry. Co.*, 189 Or 126, 136-137, 214 P2d 254, 218 P2d 720 (1950).

To a disinterested observer uninitiated in the vagaries of railroad crossing law it might appear that when a railroad crossing is occupied on a dark night by a freight train consisting of 102 box cars, with no lights of any kind between the lights on the engine one-quarter of a mile in one direction and the lights on a caboose three-quarters of a mile in the other direction, and with not even reflectors, much less lights, on any of the intervening box cars, a reasonably prudent motorist might fail to see the unlighted box cars in time to stop unless the railroad took some additional measures to warn motorists of that danger. Such a disinterested observer might also conclude that

the railroads should anticipate that a motorist might fail to see the unlighted cars on a dark night and that for this reason it would not be unduly burdensome to require that railroads attach inexpensive reflectors or strips of luminous tape on the sides of box cars, in the absence of flashing warning lights at such crossings.

On the contrary, however, and as set forth in defendant's brief in this case, this court has held, following precedents established by the courts of other states, that an unlighted train of box cars or flat cars moving over or standing upon a crossing is of itself a sufficient warning of its presence, as a matter of law, even on a dark night, so as to relieve the railroad of the duty to give any further warning in such a case and that it is the duty of the motorist to maintain such a speed and lookout as to enable him to see and avoid striking the unlighted box cars or flat cars, even on a dark night. See *Carlson v. Southern Pacific Co.,* 219 Or 77, 346 P2d 381 (1959), and *Murphy v. Southern Pacific Co.,* 223 Or 522, 355 P2d 236 (1960), among other cases.

This and other fixed and rigid rules of railroad crossing law have been criticized by legal writers.[1] These include Leon Green, who once described the rule that a train on a crossing "gives notice of its presence" as a "cliche" which has no logic other than that "the

---

[1] See, among others, 2 Harper and James, The Law of Torts 972, § 17.2 (1956), and Prosser on Torts (4th ed 1971) 188, § 35, citing McNealy v. Portland Traction Co., 213 Or 659, 327 P2d 410 (1958), as an example of a case in which many courts still follow the rule first stated by Mr. Justice Holmes in B. & O. R.R. v. Goodman, 275 US 66, 48 S Ct 24, 72 L ed 167 (1927). That rule, applied strictly, would require an automobile driver approaching a railroad crossing with an obstructed view to stop, look and listen, and if he cannot be sure otherwise that no train is coming, to get out of his car.

victim is bent on suicide."[2] According to Green, this rule "illustrates how compulsive a cliche can become in controlling the thought of the most intelligent minds." He then cites the decision of this court in *Finn et al v. Spokane, P. & S. Ry. Co.*, 189 Or 126, 214 P2d 354, 218 P2d 720 (1950).

In *Finn*, this court, over the dissent of two of its members, reversed the granting of an involuntary nonsuit under somewhat similar, although different facts, and remanded the case for jury trial, stating (at p 134):

> "* * * Some courts apply 'horse and buggy' rules to a motor age and seem to imply that there could be no liability under any factual situation. * * *"

and (at p 137):

> "We are not unmindful that the numerical weight of authority is contrary to our conclusion that there is some substantial evidence tending to show negligence. However, it is believed that the modern trend of authority is in keeping therewith. * * *"

*Finn*, however, was decided in 1950, prior to *Carlson*, *Murphy* and other more recent decisions by this court.[3]

It may also be contended that the rule to the effect that the presence of a train of unlighted box cars on a crossing gives notice of its presence, as a matter of law, so as to relieve the railroad of any

---

[2] Green, Traffic Victims: Tort Law and Insurance 49 (1958).

[3] As early as 1940, however, the rule that the existence of a train on a crossing is sufficient notice of its presence was criticized in Oregon and it was proposed that if there is evidence that the train carried no lights, the question of negligence by the railroad should go to the jury regardless of whether the crossing was otherwise "extra hazardous." See Note, 20 Or L Rev 84, 88 (1940).

duty to give further warning, even on a dark night, is inconsistent with today's trend toward the development of higher standards of care in the area of product liability, as well as in other areas of the law.[⊙] This is particularly true since the advent of comparative negligence, as well as where, as in this case, one of the decedents was a passenger in the automobile, with the result that any contributory negligence by the driver in failing to stop at the crossing is not imputable to such a decedent.

According to the majority, "[i]t may be that this state of the law will someday be re-evaluated in the light of changing conditions and values." In my opinion, that time has now arrived.

I would agree, however, that this court should not undertake to consider possible changes of such importance unless and until it has the benefit of either written briefs or oral argument on both sides of this controversial question. In this case plaintiff's reply brief did not respond to defendant's contentions and authorities on this subject. This is understandable, because plaintiff had no reason to believe that this court, having stated such a rule in several cases during the past 20 years, would now consider abandonment or change of that rule.

Under these circumstances, and because of the public importance of this question, as well as the fact that two persons were killed in this tragic accident, I would set this case for reargument, with leave to both parties to file additional briefs. Cf. dissenting opinion in *State Construction Corp. v. Scoggins*, 259 Or 371, 391, 485 P2d 391 (1971). For these reasons, I most respectfully dissent.

[⊙] See Note, The Standing Train Doctrine—An Outmoded Standard of Care, 36 Mo L Rev 586 (1971).