Argued March 10, reversed April 7, rehearing denied and original
opinion modified May 12, costs retaxed May 19, 1954

## BARBOUR ET AL. *v.* JOHNSON ET AL.

269 P. 2d 531
270 P. 2d 633

*Grant T. Anderson,* of Portland, argued the cause for appellants. With him on the briefs were King, Wood, Miller, Anderson & Nash, of Portland.

*John Sabin,* of Portland, argued the cause for respondents. On the brief were Wilbur, Mautz, Souther & Spaulding and Arno H. Denecke, of Portland.

Before Latourette, Chief Justice, and Warner, Tooze and Perry, Justices.

PERRY, J.

This is an action at law brought by the plaintiffs (who are painting contractors) against the defendants (who are partners in the business of constructing and erecting prefabricated houses) to recover the sum of $4,563.01, of which sum the defendants acknowledge $1,988.19 as due and owing to the plaintiffs. The balance of $2,574.82 claimed to be due by the plaintiffs is contested by the defendants. A jury was waived and the cause tried to the court, and from an adverse decision the defendants appeal.

The defendants assign error in the trial court's admission of certain documents and in failing and refusing to make certain requested findings submitted by the defendants; also, in failing to sustain their objection to a finding of fact to the effect that the amount found due, $4,563.01, or $2,574.82 in excess of the $1,988.19 admitted by the defendants to be due, was for work and labor done at the special instance and request of the defendants.

The facts of the case appear as follows: That sometime in April, 1948, a Mr. Locke, employed by the plaintiffs, contacted Mr. Dahl, one of the defendants and a partner in the firm of Johnson & Associates, relative to obtaining a painting contract on some 13 houses which were to be erected by the defendants at Gilchrist, Oregon; this resulted in the defendants employing the plaintiffs to paint the houses, and was evidenced by a letter from A. H. Barbour & Son to

the defendants, the terms of which were by them accepted, the letter being as follows:

"A. H. BARBOUR & SON
Painters and Decorators
2828 N.E. Alberta Street, Portland 11, Oregon

April 30, 1948

"Messrs. Johnson, Arnold [sic, Southwell], and Dahl
c/o Prefabrication Engineering Company
734 N.E. 55th Avenue
Portland, Oregon

Attention: Mr. Dahl

Gentlemen:

We are pleased to submit our quotation for painting thirteen homes which you have sold to Mr. Lindquist [sic, Gilchrist], at Lindquist [sic, Gilchrist], Oregon, for the following unit amount:

Basic, Five Hundred Fifty-One Dollars and No Cents, ($551.00), per unit. If the store rooms are to be stained, deduct Twelve Dollars and No Cents, ($12.00). If all other closets, linen rooms, etc. are to be stained, deduct Thirty-Three Dollars and No Cents, ($33.00). If all rooms, other than living room walls and ceilings, are not to be stippled, deduct Forty-Four Dollars and No cents, ($44.00). Painting each car-port, add Sixty-Five Dollars and No Cents, ($65.00). Finishing all floors, add Seventy-Eight Dollars and No Cents, ($78.00).

Our specifications for this job consists of one coat of lead and oil paint on all exterior trim, sash, doors, facia, etc, and all exterior walls shall be given one coat of Prentite. All interior trim, such as sash, doors, and facia of the kitchen cabinets shall be given one coat of enamel. All interior walls shall be given one coat of stipple paint and stipple. All interior stipple and laundry room ceilings and walls shall be given one coat of stipple paint and

one coat of enamel. All floors shall be finished with one filler sealer coat and waxed.

We will purchase from your firm all Prentite and stipple paint required for the completion of this job.

We estimate completion of this job at two weeks from the date that units become ready for painting.''

The record shows that this was the first business transaction had between the plaintiffs and the defendants. The defendants claimed that the stipple paint to be used in these buildings was a special paint purchased by the defendants, which when used correctly would properly cover the walls in one coat and was of such heavy texture that it would not be necessary to plaster or fill in joints in the woodwork. This claim is disputed by the plaintiffs.

Prior to the writing of the letter from the plaintiffs to the defendants setting forth the agreement of the parties, Mr. Locke, the representative of the plaintiffs, went to the place of business of the defendants and there examined a portion of the panels for the prefabricated houses that were to be painted. Mr. Locke testified that the following took place at that time:

"Q And could you state briefly to the Court the essence of that conversation with Mr. Dahl?

"A Mr. Dahl had some houses at Gilchrist, Oregon, to be painted. I believe there were thirteen, if I am not mistaken. The exact quantity of houses I don't quite remember. We were to—

"* * * * *

"A (Continuing) we were to give them a price for a one-coat job, of which we did.

"Q (By Mr. Denecke) Don't—Mr. Locke, maybe I can shorten this up and direct your atten-

tion to just particular things. What, if anything, Mr. Locke, was said about whether or not the interior of those houses were to be primed before they would be painted?

"A Well, they were to be primed. In other words, other—if other, further priming was necessary at the job site, it would be handled at the job site.

"Q And did Mr. Dahl tell you anything about how it was to be handled at the job site?

"A They were to have the superintendent there with that authority.

"* * * * *

"Q And what was Mr. Dahl's answer? I take it that your previous testimony was—you asked, "What do we do when they don't come primed?" Is that it?

"A Yes, that is right.

"Q And what was Mr. —

"A If there was any priming required at the job site, that was to be handled at the job site at that time. Because I don't believe they could, they were in a position at that time, I don't believe, to firmly state definitely whether all the priming would be done in Portland or not.

"* * * * *

"Q Did you discuss with Mr. Dahl the type of paint that was to be used on those houses?

"A Yes.

"Q And what did Mr. Dahl say in that connection?

"A Well, they had used this type of material which was a—I believe it had a little asphalt fiber in it, something of that nature, fiber stock material, and the—in his asking for a one-coat job, it brought up my question, what about the priming, and he said the priming would be done in the plant and the fact is they had a spray booth and with a—he had

it sprayed in the plant, that is as they went through they did their own priming, but it would leave us with a one-coat job at the job site. Well, we get the houses to the job site and we find that there was a quite a lot of priming not done, although he had previously—the arrangement, that they were to work this out at the site itself for what priming would be required..

"Q Your testimony is that you had that understanding with Mr. Dahl?

"A That's right.

"Q He is the man you had it with, no one else, I take it?

"A That is right. In other words, Mr. Dahl, you might say, and I were—worked the job more or less together."

Some of the panels for the houses at that time were primed, others were not. After the houses had been erected on the site at Gilchrist, Mr. Scruggs, the foreman on this particular work for A. H. Barbour & Son, discussed the matter of priming the interior walls on the houses not already primed with Mr. L. A. Rowland, a foreman· on the job for the defendants. Mr. Rowland said that he wanted the houses primed, and he then signed a special request presented by Scruggs for this work to be done. This work was done, which constituted the main portion of the additional claim of $2,574.82, a small portion of the claim being for closing seams with a plaster-like material called "sprackle", and the order for this, like the order for the additional painting, all arose in the same manner with defendants' foreman, Rowland.

Other orders for painting, in addition to that set forth in the contract, were on written order of the defendant R. E. Dahl as purchasing agent.

With reference to Mr. Rowland's connections with the defendants (most favorable to the plaintiffs), the defendant Mr. Dahl testified as follows:

"Q  Mr. Dahl, you admit, don't you, that priming was necessary on the trim of these houses?

"A  If it wasn't already primed, yes.

"Q  And Mr. Rowland, L. A. Rowland, was the man at Gilchrist in charge of the erecting and completing of these houses, was he not?

"A  Only when Mr. Kelly wasn't there.

"Q  When Mr. Kelly wasn't there?

"A  Yes.

"*    *    *    *    *

"Q  Mr. Dahl, a moment ago you said that Mr. Rowland was supposed to see that the painting was accomplished in the manner in which it was supposed to be done. What did you mean by that? Will you explain your answer?

"A  Well, he was supposed to pass on the quality of the work and more or less serve as our inspector.

"Q  But did he have any authority to direct how the work was to be done, whether it was, it would be one coat or two coats or the particular method of application?

"A  No.

"*    *    *    *    *

"THE COURT: As I understand your testimony, Mr. Dahl, it is that when Mr. Kelly or any other member of the association of the defendants was not present, Mr. Rowland kind of was the superintendent there and the boss.

"A  Yes, he is the man that they asked questions of.

"THE COURT: That is right.

"A  See that the work was carried out right."

■ As the basis of the defendants' contention that the court erred in failing to sustain their objection to the special finding of fact that this extra work was

done at their special instance and request, the defendants must rely upon the proposition that there was insufficient evidence to authorize this finding, this court being bound by the findings of fact of a trial court in a law case to the same extent as though the issues had been determined by a jury. Therefore, this matter rests upon the answer to the question: Does the record show that L. A. Rowland was the agent of the defendants with authority to bind the defendants in a modification of the previous agreement entered into between the two principals?

In *Phez Co. v. Salem Fruit Union et al.,* 113 Or. 398, 429, 233 P 547, we stated:

"It is a fundamental principle of the law of agency that the power of every agent to bind his principal rests upon the authority conferred upon him by that principal. Without this authority for which the principal himself, either by act or conduct, has become responsible, the agent can bind only himself: 2 C.J. 560, § 202. A principal will not be bound by an act of his agent in excess of his actual authority, where the third person has knowledge of the extent of the agent's authority, or where the facts and circumstances of the case are such as to put him upon inquiry as to the authority and good faith of the agent, as where a third person deals with an agent who is acting for himself as well as for his principal in the transaction, as such a person is chargeable with a knowledge of such facts as a proper inquiry as to the agent's powers would have revealed to him: 2 C.J. 561, § 203. As a general rule every person who undertakes to deal with an alleged agent is put upon inquiry, and must discover at his own peril that it is in its nature and extent sufficient to permit the agent to do the proposed act, and that its source is traceable to the will of the alleged principal: 2 C. J. 562, § 204."

The above case sets out the principles of law which control the matter before us. A similar situation arose in the case of *Graef v. Bowles et al.,* 119 Or 498, 248 P 1090. In that case the plaintiff Graef entered into an agreement with the defendant, Bowles, and others, a partnership doing business as the Northwest Bridge & Iron Company, whereby he agreed to furnish labor and material for painting vessels constructed by the defendants for the agreed sum of $22,685 per boat. At that time it was the custom of the ship building plants generally to require workmen employed to work only eight hours per day for a five and one-half day week, and that for all work on any day over eight hours or for work on Saturday afternoon or any time on Sunday double the ordinary wages were paid. The parties mutually understood that only a single shift of men was to be employed in accordance with the custom. Subsequently the superintendent in charge of the work for the defendants notified the plaintiff that it was necessary to speed up the work on two of the boats, and in reference to this work the plaintiff testified that to do this it would require a lot more expense for over-time. The superintendent advised him to go ahead and employ the additional labor for over-time and he would o.k. it at the proper time. No direct transaction with reference to additional payment for the result contracted for was had between Graef and any members of the partnership. With reference to that transaction, and in holding that Graef could not recover from the partnership, this court on page 508 of the opinion said:

"It is very plain under the precedents and Section 713, Or. L., [now ORS 41.740] that no reliance can be had upon conversations with the superintendent of construction had prior to the execution of the written contract set up in and admitted by the pleadings. The testimony shows that the plaintiff knew that it was necessary to go to the

purchasing department of the defendant concern to make contracts. The only conclusion to be drawn from the testimony as to the authority of Brown was that he was the executor and not the author of contracts with the firm of which he was the employee."

And the same is true of the transaction here. Plaintiffs knew that a contract in writing of a specific amount per unit for painting had been entered into; that the conversations had between Mr. Dahl and the plaintiffs' agent Mr. Locke were merged in the written agreement; and that the foreman on the job, L. A. Rowland, was the "executor" and not the "author" of the contract.

The plaintiffs seek to avoid this result by contending that this work was to be completed in a very short period of time and that "an emergency or an extraordinary condition will enlarge an agent's authority". We are unable to discover any emergency or any extraordinary condition that would enlarge an agent's authority. The plaintiffs and the defendants both had their principal places of business in Portland, Oregon, and there were telephone connections between Gilchrist and Portland. But a few minutes would have been required to determine the agent's authority and to have prepared and received an authorization between the principals which would vary the terms of the original agreement. The case of *Nicolai-Neppach Co. v. Abrams et al.*, 116 Or 424, 240 P 870, which is relied upon by the plaintiffs for this principle, presents far different facts.

There being no evidence to sustain the trial court's finding, we need not consider the other claims of alleged error made by the defendants.

The cause is reversed with instructions to enter judgment for the defendants.

ON PETITION FOR REHEARING

*Mautz, Souther, Spaulding, Denecke & Kinsey* and *John R. Sabin,* of Portland, for the petition.

*King, Miller, Anderson, Nash & Yerke,* of Portland, contra.

Before LATOURETTE, Chief Justice, and WARNER, TOOZE and PERRY, Justices.

PERRY, J.

The plaintiffs have petitioned this court for a rehearing in the above matter, stating, first, that "The Court erred in reversing the judgment of the trial Court with instructions to enter judgment for the defendants, for the reason that the amount of the judgment entered in the trial Court included the sum of $1,988.19, which sum was acknowledged by the defendants, in the pleadings, on the trial and on this appeal, and by the Court itself, to be owing to the plaintiffs"; and second, that "The Court erred in holding that there was no evidence to sustain the trial court's finding that the labor and materials in issue were furnished by the plaintiffs at the special instance and request of the defendants for the reason that there was substantial evidence to support the trial court's finding of fact."

In reversing the judgment with instructions to enter judgment for the defendants as to the item of the sum of $1,988.19 we acknowledge our error, and a judgment for the above sum should be entered by the trial court, but the balance of the claim of $4,563.01,

which contained that portion of the judgment appealed from, should be denied.

As to the second claimed error, the plaintiffs allege that there was evidence to sustain the trial court's finding that labor and materials in issue as to the balance of the judgment sought were furnished at the special instance and request of the defendants and that we overlooked and failed to consider the evidence introduced by the plaintiffs that the agent of the defendants, Rowland, had apparent authority to alter the contract previously entered into between the parties to include a two-coat painting job instead of the one-coat job provided in the contract.

We stated in our original opinion that there was no evidence of Rowland's authority. Perhaps our opinion would have been more lucid had we used the words "apparent authority" for there was equally no evidence of actual authority. "Apparent authority" is the holding out of the agent to have certain authority and after a party dealing with the agent has relied upon this appearance of authority in theory an estoppel arises to deny the authority of the agent to do the particular act or acts in controversy. 2 Am Jur 86, Agency, § 104. The evidence relied upon by plaintiffs is to the effect that prior to entering into the written contract the defendants stated, in effect, that they would have a man on the job authorized to order a priming of any of the buildings that needed priming. There is not one bit of evidence that Rowland was to be the agent of the defendants for the purpose of altering the contract subsequently entered into. Apparent authority does not arise where the lack of the agent's authority is known, or should be known, to the party dealing with the agent. While this exact language is not used in our opinion, in *Graef v. Bowles*

*et al.,* 119 Or 498, 248 P 1090, it is the rule of law there relied upon.

The petition for rehearing is denied, and our previous opinion adhered to, except as modified by entering judgment for the plaintiffs for the sum of $1,988.19, admitted by the defendants to be due the plaintiffs.

On respondents' objections to appellants' Cost Bill,

*Mautz, Souther, Spaulding, Denecke & Kinsey,* and *Arno H. Denecke* and *John R. Sabin,* of Portland, for the objections.

*King, Miller, Anderson, Nash & Yerke,* of Portland, contra.

Before LATOURETTE, Chief Justice, and WARNER, TOOZE and PERRY, Justices.

PER CURIAM.

The appellants include in their statement of costs and disbursements "Bond on appeal, $140.00" and "Renewal of bond on appeal, $140.00". The respondents object thereto as follows: "Appellants are not legally entitled to recover as costs on appeal the premium for undertaking on appeal, supersedeas or other".

Section 101-1402, OCLA, subd. 5, now ORS 747.100 (2), authorizes the recovery "of a sum paid * * * for executing any bond * * *. Such sum shall not exceed one percent of the amount of the bond * * * during each year the same was in force". The supersedeas bond filed in this case, and running for a period of more than one year, secured a contingent liability thereunder of approximately $6,000.

One percent thereon for a period of two years, as allowable under this statute, would permit a recovery in the sum of $120. *Gray v. Hammond Lumber Co. et al.*, 113 Or 570, 594, 232 P 637, 233 P 561, 234 P 261.

The respondents also object to the amounts set forth as disbursements relative to the printing of the abstract of record, printing of appellants' brief and reply brief.

The amount allowable for printing is $2 per page, including the cover. Rule 19, § 2, Rules of the Supreme Court.

The costs are retaxed and allowed to the appellants as follows:

COSTS (Statutory attorneys' fee) ............... $ 15.00

DISBURSEMENTS:

| | |
|---|---:|
| Premium on the bond | 120.00 |
| Printing abstract of record | 46.00 |
| Printing appellants' brief | 102.00 |
| Printing appellants' reply brief | 46.00 |
| Transcript of testimony | 143.00 |
| Transcript on appeal | 6.00 |
| Appellants' appearance fee, Supreme Court | 20.00 |
| Trial fee, Supreme Court | 6.00 |
| Total | $504.00 |