Argued January 18, reversed July 11, petition for rehearing
denied August 20, costs retaxed August 22, 1956

# HERRING *v.* SPRINGBROOK PACKING CO.

299 P. 2d 604
300 P. 2d 473

*Herbert Swift,* Newberg, argued the cause and filed a brief for respondent Frederick C. Herring.

*William K. Shepherd,* Portland, argued the cause for appellant Springbrook Packing Company Cooperative. With him on the briefs was O. M. Allison, Portland.

Before WARNER, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

LUSK, J.

This is an appeal from a judgment for the plaintiff, Frederick C. Herring, against the defendant, Springbrook Packing Company Cooperative, a corporation, in an action to recover damages for injury to personal property of the plaintiff. The trial was by jury. Two other defendants, C. & H. Bakery Supply Company and W. Keith Herrmann, were absolved by the jury's verdict.

The basis of the action was the alleged negligence of the defendants.

Springbrook is the owner and operator of a refrigerated storage warehouse at Springbrook, Oregon, with which the plaintiff had stored a large quantity

of walnut meats valued at more than $12,000. In the same room of the warehouse were stored a quantity of sliced apples, the property of the defendant, C. & H. Also in this room was a large ammonia freezing unit referred to in the testimony as a diffuser. On the morning of June 20, 1949, the defendant Herrmann, who was an employee of C. & H. and acting in the course of his employment, was engaged in loading a handtruck with barrels of sliced apples which he intended to remove from the warehouse. While so engaged, a barrel which he was attempting to place on the truck hit the edge of the truck bed, as a result of which the truck was set in motion towards and against the diffuser and struck and broke a valve attached to the exterior of the apparatus. Through the opening thus made liquid ammonia under pressure escaped and vaporized and filled the room. The noxious fumes penetrated the boxes containing the plaintiff's walnut meats, discolored them and materially reduced their value. The jury assessed plaintiff's damages at $8455.63, the exact amount sued for.

Omitting allegations withdrawn by the court, the charges of negligence in the second amended complaint, on which the case was tried, were as follows:

Against the defendants C. & H. and Herrmann: (1) Pushing and operating a loaded handtruck into and against the ammonia freezing unit; (2) pushing and operating said loaded handtruck without keeping a proper lookout to avoid colliding with said freezing unit.

Against the defendant Springbrook: (1) Failure to install guards, rails or other obstacles in order to protect said freezing unit from injury by handtrucks or otherwise, notwithstanding the defendant Spring-

brook well knew that defendant Herrmann and other employees of defendant C. & H. pushed and operated loaded handtrucks around and near the unit; (2) failure to provide adequate or any devices or equipment to exhaust and remove said ammonia gas after its escape from said freezing unit.

When the plaintiff rested his case defendant Springbrook moved for judgment of involuntary nonsuit. The court denied the motion, and the ruling is assigned as error. Consideration of the question requires a detailed statement of the evidence.

The following description of the premises taken from Springbrook's brief has been expressly approved in plaintiff's brief as "generally correct" and is adopted for the purposes of this opinion:

"Springbrook's warehouse included three cold storage rooms—north, center and south. The center room was about 50 feet by 90 feet, the latter being the length of the walls separating the rooms. The center room had two doors, each in about the center of the 90 foot walls, opening directly to the north and south room, respectively.

"The desired temperatures are achieved by five ammonia refrigeration machines, of which two are situated in the north room, two in the south room, and one in the center room. They stand about 10 feet high, and are mutually connected by pipes, and are dependent upon the same compressor and certain other machinery. The floors of the room are concrete. Each of the refrigeration machines is set in a depression three inches below the level of the floor. Part of that machine consists of an oil leg which accumulates excess oil. To drain that oil there is a valve extending from the oil leg. No part of any machine extends beyond the depression. The valve from the oil leg is the thing that was broken when the handtruck hit it. However, it was four and one-half inches from and

within the end of the depression, and about twenty-six inches from each side of and within the depression. The valve consisted of half-inch extra heavy pipe."

In addition to the foregoing plaintiff calls attention to the facts, as disclosed by the evidence, that the pit in which the machine stood was surrounded by a section of the concrete floor four inches in width, which sloped towards the machine at the rate of one-half inch in four inches, and that the floor drain for the room was in the pit.

Under their arrangement with Springbrook both the plaintiff and C. & H., and its employee Herrmann, had access to the storage room for the purpose of moving their foodstuffs in and out of the room, and in carrying out that work they used handtrucks made available to them by Springbrook. For about six months it had been the daily practice of Herrmann to remove apples from the storage room and transport them to Portland for delivery to customers of the firm. The apples were contained in barrels and tubs of varying weights, and occupied more than half the space in the room, which was generally kept fairly full of goods. But there was always an aisle running straight through the center of the room, and every day Herrmann passed right by the ammonia freezing machine. The accident occurred shortly after eight o'clock in the morning of June 20, 1949. There was no one in the room except the defendant Herrmann. He was loading barrels of apples on a truck which he described as "a low bed cart that was probably approximately 3 feet wide, and 5 or 6 feet long. It had one steel U-handle on the front of the cart and two small swivel wheels, and there were two stationary wheels located at the rear of the cart." The truck weighed approximately 100

pounds, and was selected by Herrmann as the one best suited to his purpose. He had placed one or two barrels of apples, each weighing 150 pounds, on the rear part of the truck, and was attempting to load a barrel weighing 100 pounds when the accident occurred. He described the accident in this language:

"It's been so long ago that the exact details are rather hazy, but as my memory of it now, I lifted the barrel to put it on the wagon, on the fore part of the wagon, and as I started to put it on the wagon the barrel hit the edge of the wagon and it swivelled around and turned about halfway under the momentum, and the handle—the steel handle on the front of the cart apparently struck the valve that has been previously mentioned."

Herrmann testified that the rear of the truck was two to four feet from the diffuser and the front was further away; that the truck, pivoting on its fixed wheels, traveled five or six feet in "more or less of a half turn", and the right front wheel—one of the swivel wheels—went into the depression surrounding the diffuser.

When the handle of the truck struck the valve "a cloud of vapor came from the pipe with a hissing noise, and I looked at it and as best as I could see it because the truck was against it and not knowing anything about refrigeration, I immediately ran out of the room, shut the door, and went to find Mr. Butler, the plant engineer."

The diffuser contained 335 pounds of liquid ammonia, which would all have escaped through the break in the valve in not more than 15 minutes and within an hour would fill the room in the form of ammonia gas. Butler hurried to the room upon being notified of the accident by Herrmann, but the ammonia gas

was by that time so thick that he could not go in. He thereupon pulled an electric switch in another room, thus cutting off the ammonia supply to the diffuser, and telephoned to Western Engineers in Portland, the firm which installed the equipment. They sent out a man with a gas mask, but the mask was not adequate and the man was unable to stay in the room without injury. About one o'clock in the afternoon, however, an ammonia gas mask having been obtained, the Western Engineers man was able to enter the room and weld the valve. This job took about 15 minutes. In the meantime, as a means of getting rid of the gas, Butler and other employees of Springbrook cut a hole in the roof and installed a fan to blow air in the center room and thus drive out the ammonia gas. In about two days they were able to resume normal use of the room.

There was no guard or barrier around the diffuser to protect it or the valve against accidents of this kind, and there were no vents or fans for use in case of the escape of large quantities of ammonia gas. Neither were there any gas masks in the plant. Springbrook's witness, Butler, conceded that a guard of steel or wood could have been constructed which would have afforded protection against such an accident.

The freezing apparatus was installed in 1945, and this was the first accident that had occurred to it.

The plaintiff's walnut meats were contained in 765 corrugated pasteboard cases. Plaintiff did not learn of the accident until about 7:30 P.M. of the day after it occurred. He went immediately to the plant, and, as the walnuts were stored close to the door of the center room, he was able to grab a box of them and remove them. Upon examination of the contents he

found that the walnut meats were discolored—ebony at the top and lighter towards the center. There is no evidence as to how quickly a large quantity of ammonia gas in the room would penetrate the boxes and cause this damage.

The defendant Springbrook was acting in the capacity of a warehouseman and received and stored the plaintiff's walnut meats for an agreed compensation. Its duty to the plaintiff, therefore, was measured by ORS 74.210, which reads:

> "A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise; but he shall not be liable, in the absence of an agreement to the contrary, for any loss or injury to the goods which could not have been avoided by the exercise of such care."

■ Plaintiff, by his complaint and evidence, assumed the burden of proving the negligence alleged. *Hansen v. Oregon-Wash. R. & N. Co.*, 97 Or 190, 213, 188 P 963, 191 P 655.

There is no evidence or claim of any defect in the diffuser or the valve which was broken when struck by the handtruck, or of negligence in the manner of installation or operation of the apparatus. The accident would not have occurred but for the intervention of the act of a third person, over whom Springbrook had no right of control, but who was in the room pursuing his activities with its knowledge and acquiescence.

The liquid ammonia in the diffuser, without more, was not dangerous to anyone. The fact, however, that it could not be released into the room without the cooperative negligence of another would not neces-

sarily defeat liability. *DeHaen v. Rockwood Sprinkler Co.*, 258 NY 350, 353, 179 NE 764; *Bannon v. Peerless Weighing & Vending Mach. Corp.*, 318 Mass 607, 63 NE2d 335; Prosser on Torts (2d ed) 139.

■ The governing rule is found in Restatement, Torts § 449, which reads:

> "If the realizable likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby."

See *Arneil v. Schnitzer,* 173 Or 179, 207, 144 P2d 707, where the rule thus stated was approved; Harper on Torts, p 173.

Much of the argument is devoted to the subject of proximate cause and whether Herrmann's act constituted an intervening cause. Many of the cases cited by the plaintiff are cases in which the evidence showed negligence of the defendant apart from the act of a third party. See, for example, *Birks v. East Side Transfer Co.*, 194 Or 7, 241 P2d 120; *Mollencop v. City of Salem,* 139 Or 137, 8 P2d 783, 83 ALR 315; *Johnson v. Hoffman,* 132 Or 46, 284 P 567; *Poole v. Tilford,* 99 Or 585, 195 P 1114; *Arneil v. Schnitzer,* supra. Here, however, in the words of the Restatement, the hazard which makes the actor negligent (if, indeed, it was negligent) is "the realizable likelihood that a third person may act in a particular manner." In a case like this the questions of negligence and proximate cause may be said to be merged into one. As stated in Harper on Torts, p 173, "But if the action of the third person is the very factor which makes the de-

fendant's conduct negligent, the question of causation is not difficult. Such expectable action is not such an intervening agency as to constitute a superseding cause, even though it is wrongful or even criminal in character." As Professor Prosser puts it, "It might be stated as a problem of duty to protect the plaintiff against such an intervening cause." Prosser on Torts (1st ed), p 367.

■ But "there is no duty to guard when there is no danger reasonably to be apprehended." Shearman and Redfield on Negligence, op. cit., p 52.

"Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence. It is always a question of what reasonably prudent men under the same circumstances would or should, in the exercise of reasonable care, have anticipated." Id., p 50. And "Ordinary care of a reasonably prudent man does not demand that a person should prevision or anticipate an unusual, improbable or extraordinary occurrence, though such happening is within the range of possibilities." *Burnside v. Gulf Refining Co.*, 166 Miss 460, 470, 148 So 219.

■ In our opinion, only wisdom after the event would have suggested to a reasonably prudent warehouseman the need of guarding against an accident such as that disclosed by the evidence in this case. The freezing apparatus was standard equipment installed by a responsible concern. The valve was made of heavy half-inch iron pipe, and was out of the path of hand-trucks which were moved across the floor of the storage room. It is not as though power-driven vehicles, moving at a high rate of speed, had been used. These

might suggest precautions which it would never occur to one to take as against the possibility of accident through the operation of handtrucks. Defendant was not an insurer of plaintiff's goods. Its duty of reasonable care did not include the duty to anticipate and guard against mere possibilities, but only, as the Restatement phrases it, "the realizable likelihood" that a third person might so act as to cause the resulting harm. We think that the evidence does not bring this case within the requirements of the rule.

■ With respect to the claim that the defendant Springbrook was negligent in failing to provide adequate devices and equipment to exhaust and remove the ammonia gas after its escape, it is sufficient to say that there is no evidence from which it could be found that such alleged failure was the proximate cause of the injury. How long the ammonia gas must have been in the room before it would damage the walnut meats by discoloration is not disclosed, and the record is equally devoid of evidence from which it could be determined that it would have been feasible to use any devices or equipment which would have prevented the damage once the ammonia gas had escaped.

The judgment is therefore reversed with directions to enter a judgment of involuntary nonsuit in favor of the defendant Springbrook.

### ON OBJECTIONS TO COST BILL

William K. Shepherd, Portland, contra.

Herbert Swift, Newberg, for the motion.

PER CURIAM.

The respondent has filed objections to certain items in the appellant's cost bill.

(1) The first objection is to "Cost of premiums for cost and supersedeas bond $600.00." ORS 747.100 (2) provides:

"In all actions and proceedings a party entitled to recover disbursements therein shall be allowed and may tax and recover a sum paid a person or company for executing any bond, recognizance, undertaking, stipulation or other obligation therein. Such sum shall not exceed one percent of the amount of the bond or other obligation during each year the same was in force."

■ Under the provisions of this section it becomes necessary to determine as near as may be the amount of the bond during each year that the same was in force. *Barbour v. Johnson,* 201 Or 375, 388, 269 P2d 531, 270 P2d 673. The judgment against the respondent, including costs, was in the principal amount of $8563.73, and was entered August 5, 1953. Appellant's supersedeas bond was filed on or about September 17, 1953. The appellant concedes that the proper charge is not in excess of $300. Taking into consideration the fact that the judgment bore interest at the rate of six percent per annum and the further fact of a contingent liability for costs in case of an affirmance, we estimate the amount properly chargeable for premiums during the three-year period that has elapsed since the appeal was taken to be $290.

■■ (2) The next objection is an item of $529.60 paid to the court reporter for preparation of the transcript of testimony. The transcript comprises 328 pages including certificate. Under ORS 21.470 the fees of the official reporter for making transcripts are fixed at 15 cents per folio of 100 words. This would bring the cost of preparation of one transcript of testimony to $147.60. The appellant seeks to charge the respondent with the

additional cost of two copies of the transcript, one of which was served on the respondent Herring and the other on the appellant's codefendants in the circuit court, C. & H. Bakery Supply Company, a corporation, and W. Keith Herrmann. The authority given to the prevailing party on appeal to this court to tax as costs the expense of preparation of the transcript of testimony is found in ORS 20.310, and is expressly limited to a transcript which necessarily forms part of the record on appeal. We have repeatedly held that there is no authority to tax as costs the expense of extra copies of the transcript which may be furnished to the opposing parties on the appeal. *Buckles, Exec. v. Continental Cas. Co.,* 197 Or 128, 141, 251 P2d 476, 252 P2d 184; *Spicer v. Benefit Ass'n of Ry. Emp.,* 142 Or 574, 604, 17 P2d 1107, 21 P2d 187, 90 ALR 517; *Campbell Co. v. Corley,* 140 Or 462, 483, 3 P2d 776, 13 P2d 610, 14 P2d 455; *Bell v. Spain,* 110 Or 114, 135, 222 P 322, 223 P 235, and cases there cited. The appellant argues that the bill of exceptions consisted of the entire testimony, and that it was mandatory for the appellant to serve copies thereof upon the other parties to the appeal before the bill of exceptions could be settled. Counsel refer to ORS 19.100, which prescribes the procedure for the settlement of a bill of exceptions, but we find no requirement in that or any other section of the code for the service of a proposed bill of exceptions upon the opposing party. We realize that under the rules of some judicial districts all papers filed in a case must be served upon the adverse party. But, even though such a rule be harmonious to the provision of the statute governing the procedure for settlement of a bill of exceptions, it could not possibly extend the provisions of the statute for the taxation of

costs, as this is a matter purely within the competence of the legislature.

■ (3) The final objection is to an item of $30 for costs paid by the appellant to its codefendants. The appellant says that this was a "necessary disbursement" within the meaning of those words as used in ORS 20.020. We agree that it was necessary for the appellant to pay it, but we do not agree that it is a taxable item against the respondent. The appellant evidently considered that its codefendants were necessary parties to the appeal, and, acting under that erroneous notion, served them with notice of appeal. They moved to dismiss the appeal, and, under date of February 3, 1954, this court entered an order allowing such motion. Thereafter the codefendants served the appellant with a cost bill in the amount of $30, which was paid. It was the appellant's own mistake in attempting to make its codefendants a party to the appeal which brought about its liability for the amount in question. The item is no concern of the respondents and is not taxable here as costs.

The costs are retaxed and will be allowed to the appellant as follows:

| | |
|---|---:|
| Clerk of the Supreme Court, filing fee | $ 20.00 |
| Clerk of the Supreme Court, trial fee | 6.00 |
| Bertha Marshall, Reporter, preparation of transcript of testimony | 147.60 |
| Printing, at $2 per page, as follows: | |
| Appellant's Abstract of Record | 82.00 |
| Appellant's Brief | 256.00 |
| Appellant's Reply Brief | 126.00 |
| Cost of premiums for cost and supersedeas bond | 290.00 |

| | |
|---|---:|
| Clerk of the Circuit Court of Yamhill County, Oregon, preparation of transcript on appeal | 9.00 |
| Sheriff of Yamhill County, Oregon, service of Notice of Appeal and Motion | 7.10 |
| Statutory attorneys' fee | 15.00 |
| Total | $958.70 |