Argued June 6, 1966, reversed with instructions September 20, petition for rehearing denied October 17, 1967

BROWN, *Respondent, v.* SPOKANE, PORTLAND AND SEATTLE RAILWAY COMPANY ET AL, *Appellants.*

431 P. 2d 817

*Cleveland C. Cory,* Portland, argued the cause for appellants. With him on the briefs were Clarence R. Wicks, and Davies, Biggs, Strayer, Stoel and Boley, Portland.

*William C. Grant,* Portland, argued the cause for respondent. With him on the brief was Ben T. Gray, Portland.

Before PERRY, Presiding Justice, and SLOAN, GOODWIN, DENECKE, HOLMAN, LUSK and HAMMOND, Justices.

PERRY, C. J.

The plaintiff Viola V. Brown, while riding as a passenger in an automobile driven by her husband, was injured when the automobile and a diesel engine operated by the defendant Spokane, Portland and Seattle Railway Company collided near the intersection of northwest Front avenue and northwest 14th avenue in the city of Portland.

Plaintiff filed an action for damages in the circuit court for Multnomah county; the cause was tried to a jury and a verdict was returned for the defendants.

The trial court set aside the verdict on the basis of the misconduct of one of the jurors because he made unauthorized visits to the intersection on northwest Front avenue where the accident occurred. From the order granting a new trial, the defendants have appealed.

■ Defendants contend on this appeal that the trial court erred in failing to direct a verdict in their favor. This assignment of error requires an examination and consideration of the facts in a light most favorable to the plaintiff, although there is little material dispute in the evidence.

Northwest Front avenue, in the area where the accident occurred, is a four-lane city street running in a northwesterly and southeasterly direction. Two traffic lanes are for northwesterly vehicular traffic and two are for the use of vehicles traveling southeasterly. For the sake of convenience we will hereafter refer to this street as running north and south.

The area where this accident occurred is entirely industrial. There are numerous railroad tracks on the west side of the street, including the east and west-bound mainline tracks of defendant railway, and numerous spur tracks on the east side of the street to serve the docks on the Willamette river close by. The west side of the track of the defendant enters onto Front street approximately 190 feet north of the north edge of northwest 14th avenue, continues across Front avenue diagonally to the southeast, a distance of approximately 200 feet, and a short distance further southeast connects with numerous spur tracks of the defendant railway. Northwest Front avenue is lighted at night on the east side by mercury vapor street lights, but not on the west side. A few feet to the north of

the intersection of northwest Front avenue and northwest 14th avenue there is provided a pedestrian crossing with an intermittent flashing yellow caution light located in the center of northwest Front avenue and this light may be caused to turn red when a button is pushed, stopping all motor vehicle traffic.

The early morning of March 14, 1961, was one which found the weather conditions typical for Portland at that time of year. It had been raining and misting. The pavement was wet. Plaintiff's husband was driving the automobile north on Front avenue at a speed of 25 to 35 miles per hour. The windshield wipers of his car were in use and the headlights were on in a dim position. Plaintiff was in the front seat of the car with her husband and a Scottish merchant seaman. The rear seat was occupied by another merchant seaman. The Browns had met both men earlier in a local nightclub. Mr. Brown, an ex-merchant seaman himself, had offered to take the two men back to their ship and they in turn had agreed to take the Browns aboard the ship for a tour that morning, if possible.

At the same time that the Brown automobile was traveling north on Front avenue, the defendant's switch engine was moving forward in a southeasterly direction on the previously described track at a speed of four to five miles per hour. The engine was furnished with a yellow oscillating light, ground light, headlight, engine number light, scotch guard type reflector tape on its front end and along each side, and a twelve-inch bell. All of this equipment was functional and in operation. In addition, two switchmen carrying lighted lanterns were riding outside of the cab on the front platform of the engine. Operating the engine was defendant Richard Hubbell, a fireman who was getting engineer experience. These employees

of defendant railway stated that they first observed the Browns' car when it was 400 to 750 feet from the engine. Assuming that the car would yield, Hubbell placed his hand on the engine brake lever to slow down, but not intending to stop. As the automobile moved closer to the engine, the two switchmen began vigorously swinging their lanterns from side to side in an attempt to give added warning to the oncoming vehicle. When it became apparent that the automobile was not going to stop, Hubbell fully applied the brakes, but the engine slowly continued to move at an angle four to five feet into the second northbound lane of Front avenue and the Brown automobile struck it. Brown testified he was driving in the outside or right-hand northbound lane. The northbound lane in which Brown was traveling is 21 feet in width.

Plaintiff testified that she noticed the engine just before the collision and shouted a warning. Mr. Brown also saw the engine immediately before the impact and applied the brakes.

At the time of the accident, there were no obstructions to the view looking to the north on Front avenue to the point of impact, but visibility was characterized by the plaintiff's witnesses as very poor because of darkness and rain. Despite the poor lighting and the inclement weather conditions, Mr. Brown noticed the flashing pedestrian light, previously mentioned, while still an undisclosed distance from it. He was also familiar with the area and knew there were numerous track crossings. Donald MacDonald, one of the passengers in the front seat, saw the light on the engine when, by his estimate, the Browns' car was 200 yards away from it. He also noticed the lights from the switchmen's swinging lanterns some "minutes" before noticing the engine.

There is no evidence that there were any natural or artificial barriers which would impair the vision of a driver at any distance before the engine would enter the street, nor is there any evidence of the number of times these tracks are used or the speed at which the switching operation is conducted across this street, other than that on this occasion it was proceeding at approximately five miles per hour.

Also, there is no evidence that at the time of this occurrence there were any distracting noises so that the engine bell could not be heard at a reasonable distance by an attentive person. It must also be noted there is no evidence that it was customary to have a flagman at the crossing as alleged by the plaintiff.

In the complaint, the plaintiff alleges:

"IX

"That at all of the times herein mentioned and particularly on March 14, 1961, said railroad crossing was an extra-hazardous highway and railroad crossing in that said track crossed said roadway at an acute angle; that said crossing was adjacent to an extensive railroad switching yard which produced distracting noises and lights; in that the illumination at said crossing was deceptive in that it minimized the existence of the crossing and the approach of trains; in that it was a rainy, overcast night; in that it was in the midst of a noisy, active, industrial center; in *that it was customary to have a flagman prior thereto at said crossing.* That said condition was known to defendant railroad. (Emphasis supplied.)

"X

"That said defendant railroad was careless and negligent in failing to install crossing gates, or flashing wigwag lights, or to use a flagman, or to set out flares, or use other similar types of crossing

protection commensurate with the dangers and hazards actually existing and to be anticipated at said crossing at the time and place of the happening of the accident herein referred to."

The plaintiff's allegations are that the crossing where she was injured at the time of the accident was extrahazardous and, therefore, placed upon the defendant railroad company the duty to use extraordinary care in the operation of its engine upon and across the street.

■ A crossing is in law extrahazardous when unusual circumstances or conditions exist making it so dangerous that the reasonably prudent person cannot safely use it unless measures are taken in excess of those normally used to warn the traveler of the approach or presence of a train. *Finn et al. v. Spokane, P. & S. Ry. Co.,* 189 Or 126, 214 P2d 354, 218 P2d 720; *Doty v. Southern Pacific Co.,* 186 Or 308, 321, 207 P2d 131; *Case v. N. Pacific Terminal Co.,* 176 Or 643, 160 P2d 313; *Fish v. Southern Pacific Co.,* 173 Or 294, 143 P2d 917, 145 P2d 991.

This same thought was also expressed by this court in *Hunt v. Douglas,* 238 Or 560, 562, 395 P2d 774, where we said:

"But if, under the existing conditions, the railroad can reasonably anticipate that a motorist using due care would nevertheless be likely to collide with a train at the crossing, the crossing is termed 'extrahazardous' and the railroad must provide some special warning."

■ Therefore, while it is the rule that the presence of a train upon the track is itself sufficient notice of danger, such rule is not applicable where a crossing is in fact extrahazardous.

■ The question of whether a crossing is extrahazardous is usually a question of fact to be determined by the jury, *Case v. N. Pacific Terminal Co.,* supra, where there are facts from which reasonable men may draw a conclusion that because of existing conditions a reasonably prudent person might nevertheless be injured in crossing.

In this case, although there is evidence that the tracks crossed a busy street in the city, there is no evidence that at this hour in the morning when this accident occurred traffic was heavy. *Carlson v. Southern Pacific Co.,* 219 Or 77, 346 P2d 381.

■ Also, the only other claim of conditions existing is that it was raining. This court has stated that heavy rain and strong winds do not create a condition making railroad crossings extrahazardous, either as a matter of law or of fact. *Hunt v. Douglas,* supra; *Schukart v. Gerousbeck,* 194 Or 320, 241 P2d 882.

■ Since there is no evidence upon which a reasonable finding could be made that the accident occurred at an extrahazardous railroad crossing, and there is evidence that the railroad company not only exercised the usual care but extra care by having switchmen with lighted lanterns on the forward platform of the engine, we conclude that there was a failure of proof as to any negligence on the part of the defendants and that it was error to submit this issue to the jury.

The plaintiff also contends that, since she alleged the defendants were negligent in failing to control the engine "when in the exercise of reasonable care it became evident that the car in which plaintiff was in was not stopping at the approach to said crossing and defendants had the opportunity to stop said engine," a fact question as to defendants' negligence was presented for the determination of the jury.

Plaintiff relies upon *Lindsey v. Southern Pacific Co.*, 240 Or 11, 399 P2d 152. The facts in *Lindsey* are quite different from this case. In *Lindsey* there was evidence from which the jury could have found that the operator of the train observed, or by maintaining a proper lookout should have observed, that the automobile in which plaintiff was riding was in a position of peril astride the railroad tracks. The majority were of the opinion that where a party is in a known position of danger, the railroad may not rely upon the presumption that anyone seen on a public crossing will observe his danger and will then remove himself from a position of danger, but must, when the opportunity is present, put its train under control so that if the car remains on the track it can, if possible, avoid the collision.

■ *Lindsey* does not purport to change the rule that, while the rights of travelers on the highway and the obligations of a railroad company are reciprocal at grade crossings, a train cannot be expected to stop and give precedence to an approaching traveler to first cross over the crossing. *Robison v. Oregon-Wash. R. & N. Co.*, 90 Or 490, 176 P 594; *Hendrickson v. Union P. R. Co.*, 17 Wash2d 548, 136 P2d 438, 161 ALR 96.

■ Nor does *Lindsey* purport to set aside the rule that the operator of a train may act on the belief that a traveler on the highway will stop before reaching the track and yield the right of way. *Layne v. Portland Traction Co.*, 212 Or 658, 319 P2d 884, 321 P2d 312; *Robison v. Oregon-Wash. R & N. Co.*, supra; *Hoyum v. Duluth W. & P. Ry. Co.*, 203 Minn 35, 279 NW 729; *Bixby v. Boston & M. R. Co.*, 94 NH 107, 47 A2d 575, 167 ALR 590; 44 Am Jur 749, Railroads, § 509.

■ Since there is no duty to anticipate the negligence of a traveler approaching a grade crossing, no

duty is placed upon the operator of the train to avoid injuring the approaching traveler until such time as a reasonably prudent person could from all the facts available ascertain a traveler is unaware of the approaching train, and, when that determination is made, stop the train, if possible, to avoid striking the approaching vehicle.

In the present case, the only evidence upon these fact questions comes from the train crew. The operator of the engine testified that he first noticed the automobile approaching from the southeast on Front avenue approximately 750 feet away just as the engine, moving at approximately five miles an hour, moved onto Front avenue. The automobile came on at an even pace, which he estimated was about 30 or 35 miles per hour. As he got onto the street he shut the throttle off and was just coasting with his hand on the brake valve. He then testified:

"Q All right. Can you tell us where the engine was when you realized they weren't going to stop?

"A Well, I can estimate, I would imagine it would be—.

"Q Do you want to use this, Exhibit 20 for identification?

"A. It would be easier. I would imagine it would be around the center of the street."

The two brakemen on the front of the engine had been waving their lanterns and the automobile was then, according to the engineer's non-oral estimate made on a map drawn to scale and the point then measured, approximately 200 feet away. He then stated: "I stopped as soon as I could when I realized they weren't going to stop." He also estimated the front of the engine was stopped four to five feet into

the lane in which the automobile was traveling. He made no oral estimate of how far the engine traveled after he realized "they weren't going to stop," but by measuring the distance on a map drawn to scale from where he marked the stopping of the front of the engine back to the center line of the street is a distance of 30 feet. He testified that the engine was stopped just before it was struck by the automobile. When asked how long the engine was stopped, he answered, "Oh, just one, two, like that." He also estimated that at the speed the engine was traveling the engine could be stopped in 10 feet. This latter statement was not amplified. It could mean either after notice of danger, or the valve is opened, or after the brakes are actually applied.

From the above facts, plaintiff argues that, since the operator testified that the engine could have been stopped in 10 feet, it could have been stopped before it entered the lane in which plaintiff was being driven, and, therefore, defendants were negligent in not acting with sufficient speed in this emergency to avoid the injury suffered by plaintiff.

The difficulty with this argument is that it must be noted that there is no substantial evidence of where the engine was when the engine operator first believed that the automobile had reached the point of no return. The operator's oral statement discloses his uncertainty upon this fact and that he was only making a guess.

> "* * * A mental impression fails to rise to the dignity of admissible testimony if. it consists of nothing more definite than a guess or a conjecture. * * * In order to be admissible a fact should not be so indefinite that no certain and definite inference can be drawn from it." *Scarpelli v. Portland Elec. Power Co.,* 130 Or 267, 276, 277, 278 P 99.

It follows without doubt that, if a mere guess or conjecture is not admissible testimony, it would not suffice as substantial evidence of a fact.

Before it can be said that the engine should have been stopped sooner by a reasonably prudent operator, certainly one must have facts from which a reasonable person can judge the distance it traveled before stopping.

"  *  *  * The distance of the train from the point of collision and its speed—so long as it is not illegal —at the various points of its approach as plaintiffs sought to develop, are not of much importance. The crucial and decisive element in the decision begins with the split second of discovery that the vehicle will not stop and involves what happens thereafter.  *  *  *." *Brown v. Louisville and Nashville R. R. Co.,* 234 F2d 204, 206 (5th cir, 1956).

Also, there is no dispute in the evidence but that the operator of the engine applied his brakes as soon as he realized that the operator of the automobile was not going to stop, and that he stopped the engine.

To reason as does the plaintiff is to reason backward from the fact that there was an accident to its cause, to thus discover a possible means of avoiding it, but such reasoning does not prove negligence.

"  'Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence. It is always a question of what reasonably prudent men under the same circumstances would or should, in the exercise of reasonable care, have anticipated.' [Shearman and Redfield on Negligence], p. 50" *Herring v. Springbrook Packing Co.,* 208 Or 191, 200, 299 P2d 604, 300 P2d 473.

"The fact that it [the accident] was avoidable does not prove that there was fault in not anticipating and providing against it." Judge Cooley in *Sjogren v. Hall,* 53 Mich 274, 278, 18 NW 812.

█ It is a well-established rule of law that needs no citation of authority that an actor may not be held liable for a mistake of judgment when formed in or under the stress of an emergency.

█ In the matter before us, there was no fault in not anticipating the accident, for the operator of the engine was not required to anticipate the negligence of the driver of the automobile in which the plaintiff was riding. His sole duty was to try to avoid striking the automobile, and this he did. We are at a loss to see what more a reasonably prudent person as operator of an engine could do to avoid the injury than to brake the progress of the engine. All of the facts disclose that the operator of the engine was alert and attentive to his duties at all times and as soon as he realized the situation he did everything he could to relieve the peril into which the plaintiff was being driven. There is no substantial evidence upon which a finding of negligence on the part of the operator of the engine could be rested.

The plaintiff also contends that the trial court was not in error in denying defendants' motion for a directed verdict because the court erred in striking from plaintiff's complaint the following allegations of defendants' negligence:

"VIII

"That at all times material hereto, there was in full force and effect a duly and properly enacted ordinance, No. 76339, of the City of Portland, Oregon, Section 19-1806 as amended by Ordinance No.

80685; and 110956, entitled Safety Contrivances At Railroad Crossings, which read as follows:

> " 'All railroad companies, except the Portland Traction Company, operating lines within the City of Portland shall install, maintain, and operate manual or mechanical signals or other warning devices at the intersections of their respective rights of way or lines on city streets, with streets and avenues within the City of Portland subject to the approval of the Commissioner in charge of railroad track matters. A record of such installaton shall be filed with the Auditor of the City of Portland and shall be deemed an official record.'

### "XI

"That defendant railroad was negligent in failing to comply with the aforementioned city ordinance in the installation, maintenance and operation of signals and warning devices mentioned therein."

It appears the trial court struck these allegations on the basis that the state had preempted the field in determining the necessity for the installation of mechanical devices to warn travelers on public roads of the approach of trains at grade level intersections.

ORS 763.170, as applicable at the time of this occurrence, provided that any city could petition the Public Utility Commissioner for a declaration that where "a public highway and railroad cross one another at the same level" said crossing is unsafe and dangerous to travelers on the highway, and granted to the Public Utility Commissioner authority, if the crossing is found dangerous, to direct the railroad to install and maintain proper warning signals, gates or other devices to warn and protect the public.

The plaintiff contends that this statute did not vest exclusive authority in the state to find that a grade

crossing is hazardous and direct the remedy to warn travelers on the highway, since ORS 760.050 provides that "[t]he power to fix and regulate the speed of railway trains within the limits of cities of less than 100,000 population is exclusively in the state" and the Commissioner may also order the installation of warning signal devices at grade crossings.

Plaintiff argues that since ORS 760.050 does not grant the Commissioner power to regulate the speed of trains in cities over 100,000, it was the legislative intent to leave with such cities their general police powers, not only to regulate the speed of trains within such cities, but also the power to cause the establishment of warning signals.

We cannot agree. ORS 763.170 applied to all cities in Oregon, regardless of size, and specifically provided that the Public Utilities Commissioner alone must determine what grade crossings in the state are dangerous and the type of warning device to be used to warn the traveler. If such determinations are left exclusively to the state, there is no room left in which the cities may act on this matter.

Since this case must be reversed with instructions to enter judgment for the defendants, it is unnecessary to consider other errors assigned.

Reversed with instructions to enter judgment for the defendants.

DENECKE, J., dissenting.

I dissent from that part of the opinion holding that the charge that the defendants failed to exercise proper control presented no question of fact and the defendants were entitled to a directed verdict.

The engineer testified that he estimated the loco-

motive was in the center of the street and was traveling two to five miles per hour when he realized the automobile in which plaintiff was riding was not going to stop. He also testified that at that speed he could stop the locomotive in ten feet. At the time of the collision the locomotive had traveled 30 feet from the center of the street and was four feet within the lane of travel in which the automobile was being operated.

From this evidence I am of the opinion that the jury could infer that the engineer did not exercise reasonable control. It could have found that in the exercise of reasonable control the engineer could have stopped the locomotive before it entered the lane of travel in which the automobile was being operated.

The practical necessity of permitting trains to move expeditiously is a good reason not to permit juries to hold a fast-moving train negligent for failing to stop at every vehicle crossing when an automobile is approaching. That reason is not present where the engineer knew the automobile was not going to stop and the locomotive was being operated at a speed which permitted it to be stopped before it entered the automobile's lane of travel. In such circumstances I am of the opinion that the issue of control is one for the jury. *Bailey v. Pennington,* 274 F2d 328 (8th Cir 1960).

SLOAN and HOLMAN, JJ., concur in this opinion.